**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

| | |
|---|---|
| PHILLIP BIVENS; the ESTATE of LARRY RUFFIN; the ESTATE of BOBBY RAY DIXON; LATURAS SMITH; and CARRIE STRONG, | Civil Action No. 2:13-cv-8 (KS)(MTP) |
| Plaintiffs, | |
| v. | |
| FORREST COUNTY; CITY OF HATTIESBURG; Hattiesburg Police Officer RAYMOND HOWELL; Forrest County Sheriff GENE WALTERS; Forrest County Sheriff's Deputies JOE HOPSTEIN, HERBERT HART, TERRY MARTIN, and HENRY "RED" BROWN; Forrest County Regional Jail Complex Guards WAYNE R. TAYLOR and JIM ERWIN,; the ESTATE of EARNEST "ARLON" MOULDS; the ESTATE of LARRY JAMES; the ESTATE of R.E. "EDDIE" CLARK; and JOHN and JANE DOE Officers and Supervisors, | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiffs Phillip Bivens, the Estate of Larry Ruffin, the Estate of Bobby Ray Dixon, Laturas Smith, and Carrie Strong, by and through their attorneys, the law firms of Neufeld Scheck & Brustin, LLP; Lathrop & Gage LLP; and Precious Martin Sr. & Associates, PLLC, hereby allege as follows:

1.      Larry Ruffin, Phillip Bivens, and Bobby Ray Dixon collectively spent 83 years in prison for a rape and murder DNA ultimately proved that they did not commit.  At the time of their wrongful convictions, Mr. Ruffin was the father of two young girls (Laturas

1

Smith—who goes by Nikki Smith—and Carrie Strong), and Mr. Bivens was planning to get married to his girlfriend.  Meanwhile, the wrongful arrest, conviction, and imprisonment of these men left the real perpetrator, Andrew Harris, free to commit a second brutal rape a few years later.  This tragedy was the result of Defendants' subversion of the judicial process in order to "solve" these crimes at any cost.

2.      None of the evidence collected at the crime scene connected the innocent Mr. Ruffin, Mr. Bivens, or Mr. Dixon to the crime.  No witness ever claimed to have seen any of the men at the scene.  Nevertheless, Defendants—Forrest County and Hattiesburg law enforcement officers investigating the crime—almost immediately focused on Larry Ruffin as a suspect, and when, by three weeks after the murder, they were unable to generate any true evidence implicating him, they arrested Mr. Ruffin and beat and otherwise coerced a confession out of him. Even with the confession, the prosecution of Mr. Ruffin suffered from many serious problems. Because Mr. Ruffin's coerced statement was false—he was innocent—Defendants could produce no corroborating evidence, and there were numerous witnesses to his beatings.

3.      L.P.,[1] the four-year-old child of the victim who witnessed the rape and murder, said repeatedly to law enforcement officials and others that there was *one single attacker*. Nevertheless, 16 months after the crime and shortly before Mr. Ruffin's trial, Defendants rounded up first Mr. Dixon, and then Mr. Bivens, and coerced statements out of each that they had committed the rape and murder of E.P. with Mr. Ruffin.  Defendants then used these compelled statements, as well as other coercive means, to pressure Mr. Dixon and Mr. Bivens to plead guilty and testify against Mr. Ruffin.

---

[1] In an abundance of caution, this Complaint refers to the victim and her family by their initials to protect their privacy.

4.       Mr. Ruffin, Mr. Bivens, and Mr. Dixon were only imprisoned because the individual Defendants used racially-charged threats and violence to coerce their false confessions, fabricated evidence, ignored evidence that pointed away from these men as suspects, withheld exculpatory and impeachment evidence, and conspired to prosecute them without probable cause.  The individual Defendants' actions were undertaken in accordance with the customs and policies of the Forrest County Sheriff's Department and the Hattiesburg Police Department.  The individual Defendants' actions were also the foreseeable result of those entities' failure to supervise, discipline, and train them.

5.       As a direct result of Defendants' misconduct, Mr. Ruffin, Mr. Dixon, and Mr. Bivens sustained injuries and damages including bodily and personal injuries; pain and suffering; physical assault; mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation of themselves and of their families; degradation; restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, and family relations, which began in 1979, and for Mr. Bivens continues to date, and for Mr. Ruffin and Mr. Dixon continued until the date of their untimely deaths.  Defendants' misconduct also led to the unnaturally early deaths of Mr. Ruffin and Mr. Dixon, as well as the serious illness of Mr. Bivens.

6.       In 2010, thirty years after their wrongful convictions, DNA testing conducted on semen recovered from E.P.'s body at autopsy matched another man, Andrew Harris, and excluded Mr. Ruffin, Mr. Dixon, and Mr. Bivens as the sources of the DNA profile. Andrew Harris was then in prison for another rape committed near Hattiesburg shortly after E.P. was raped and murdered.  Mr. Ruffin, Mr. Dixon, and Mr. Bivens—who did

not know Mr. Harris—were exonerated in 2010 and 2011. Neither Mr. Ruffin nor Mr. Dixon lived to see their official exonerations. Mr. Ruffin died in prison in 2002, and Mr. Dixon died in 2010, shortly after his release from prison on medical parole and five weeks before he was officially exonerated.

7.     As a direct result of the individual Defendants' misconduct, Plaintiffs Nikki Smith and Carrie Strong were also denied their right of familial association with their father Larry Ruffin. Defendants' actions in causing Mr. Ruffin's wrongful arrest and conviction caused Nikki Smith and Carrie Strong the following damages: loss of the companionship and care of their father; pain and suffering; severe mental anguish; humiliation; degradation; emotional distress; and loss of family relationships.

## JURISDICTION

8.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because all claims arise under 42 U.S.C. §§ 1983 and 1985.

## VENUE

10.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of Mississippi, the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

### Wrongfully Convicted Plaintiffs

11.     Plaintiff Phillip Bivens is a resident of the State of Louisiana.  He resides in New

Orleans, Louisiana.  At the time of his wrongful arrest, Mr. Bivens was a resident of the

State of California.  When Mr. Bivens was arrested in California in 1980, he was

forcefully brought back to Mississippi where he remained in jail or prison for the next

thirty years until his exoneration in 2010.

12.     Plaintiff Larry Ruffin was a citizen and resident of the State of Mississippi until

his death in prison in 2002.  Claims on behalf of Mr. Ruffin are brought in the name of

his estate.

13.     Plaintiff Bobby Ray Dixon was a citizen and resident of the State of Mississippi

until his death in November 2010 shortly after he was released from prison and five

weeks before he was officially exonerated.  Claims on behalf of Mr. Dixon are brought in

the name of his estate.

### Familial Association Plaintiffs

14.     Plaintiff Laturas Smith, who goes by Nikki Smith, is a citizen and resident of the

State of Mississippi.  At the time of her father Larry Ruffin's wrongful arrest and

conviction, Nikki Smith was also a citizen and resident of the State of Mississippi.  Nikki

Smith currently resides in Hattiesburg, Mississippi.

15.     Plaintiff Carrie Strong is a citizen and resident of the State of Mississippi.  At the

time of her father Larry Ruffin's wrongful conviction, Carrie Strong was also a citizen

and resident of the State of Mississippi.  Carrie Strong currently resides in Eastabuchie,

Mississippi.

**Defendants**

16.     Defendant Forrest County is a political subdivision of the State of Mississippi, was the employer of Defendants Hopstein, Hart, Martin, Brown, Taylor, Erwin, Moulds, Clark, James, and John and Jane Doe Officers and Supervisors and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Forrest County Sherriff's Department (the "FCSD" or the "Sheriff's Office").

17.     Defendant City of Hattiesburg is a municipality that is a political subdivision of the State of Mississippi, was the employer of Defendants Howell and John and Jane Doe Officers and Supervisors, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Hattiesburg Police Department (the "HPD" or the "police").

18.     Defendant Gene Walters at all times relevant to this complaint was the duly elected and acting Sheriff of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his official and individual capacities.

19.     Defendant Joe Hopstein at all times relevant to this complaint was the duly appointed and acting Chief Criminal Deputy Sheriff of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

20.     Defendant Herbert Hart at all times relevant to this complaint was a duly appointed and acting sheriff's deputy of the FCSD and the chief jailer of the Forrest County Regional Jail Complex, acting under color of law pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

21.    Defendant Henry "Red" Brown at all times relevant to this complaint was a duly appointed and acting sheriff's deputy of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

22.    Defendant Terry Martin at all times relevant to this complaint was a duly appointed and acting sheriff's deputy of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

23.    Defendant Wayne R. Taylor at all times relevant to this complaint was a duly appointed and acting jail guard of the Forrest County Regional Jail Complex ("FCRJC"), acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

24.    Defendant Jim Erwin at all times relevant to this complaint was a duly appointed and acting jail guard of the Forrest County Regional Jail Complex, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi.  He is sued in his individual capacity.

25.    Defendant Earnest "Arlon" Moulds at all times relevant to this complaint was a duly appointed and acting Chief Investigator for Forrest County and the head of the task force into the death of E.P., acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the state of Mississippi.

He was a resident of Mississippi until his death in 1997 in Forrest County, Mississippi. Claims against Defendant Moulds are brought against his estate.

26.     Defendant Larry James at all times relevant to this complaint was a duly appointed and acting sheriff's deputy of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi. He was a resident of Mississippi until his death in 2009 in Jones County, Mississippi. Claims against Defendant James are brought against his estate.

27.     Defendant R.E."Eddie" Clark at all times relevant to this complaint was a duly appointed and acting sheriff's deputy of the FCSD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Forrest County and the State of Mississippi. He was a resident of Mississippi until his death in 2005 in Forrest County, Mississippi. Claims against Defendant Clark are brought against his estate.

28.     Defendant John and Jane Doe Officers and Supervisors are officers and/or supervisors with names yet unknown who were appointed and acting officers and/or supervisors of the FCSD or HPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of Mississippi and either Forrest County or the City of Hattiesburg.  They are sued in their individual capacities.

## FACTS

### The Crime and Initial Investigation

29.     On the evening of Friday May 4, 1979, E.P., a 25-year-old white housewife, was home alone with her two young boys in Eatonville, a small suburb of Hattiesburg.

30.     At around 10 p.m. that night, Andrew Harris, a 28-year-old 5'8" light-skinned and bushy-haired African-American man who lived near E.P.'s house, parked his car in the driveway and broke into the house.  Harris brutally raped E.P. in her bedroom.  Her screams woke up her 4-year-old son, L.P., who came to the doorway, saw his mother being attacked, and cried out to Harris to stop hurting his mother.  Harris told L.P. to "shhhh" before he stabbed E.P.  L.P. watched as Harris walked to the front door, again said "shhhh," and let himself out.

31.     E.P. staggered to her neighbor's house trailed by her terrified boys, L.P. and two-year-old S.P.  E.P. then collapsed on the ground.  Emergency personnel, who arrived within minutes, pronounced her dead at the scene.

32.     This brutal rape and murder sent shock waves through the small community of Eatonville.  Defendants—law enforcement officers from the Forrest County Sheriff's Department and the Hattiesburg Police Department—sprang to action.  Within hours of the crime, dozens of police officers and Sheriff's deputies were on the scene, setting up roadblocks around the neighborhood and visiting neighborhood bars for any evidence of the attacker.  Within days, a law enforcement task force, including officers from the FCSD, the HPD and the Mississippi Highway Patrol, was formed to investigate the murder. Defendant Former Hattiesburg Police Chief Arlon Moulds, then serving as an investigator for the Forrest County District Attorney's Office, was named as the head of the task force. Given the nature of the crime, Defendants faced immediate and intense pressure to find and punish the perpetrator.

33.     L.P. told his neighbor that "A black man tried to hurt my mommy."  L.P. told officers, including Defendants, that one and only one African-American man with bushy

hair attacked his mother, that this man was someone he had not seen before, and that the man left out of the front door after telling him to keep quiet. L.P. said that he had seen a car outside. He described the knife the attacker used as being an eight-inch silver blade. In short, as L.P. told officers, including Defendants, "there was one boy and he was bad."

34.     Defendants collected, recorded, and sent for processing dozens of pieces of evidence, including blood, hair, fibers, and fingerprints. Among these were several latent fingerprints and shoe prints from inside and outside the house; a cast of the tire impression from the driveway; Negroid hairs recovered from the bed; blood from the bed, bedroom curtains, bedroom door, and carport; and a rape kit collected from E.P. during the autopsy. In addition, a broken towel holder in the kitchen indicated that a towel had been taken from the scene. The weapon used to stab E.P. was not found at the scene.

35.     Out of this evidence, there were several forensic leads. For example, one latent fingerprint recovered from the bedroom was not matched to any person in the family, and thus plausibly came from the killer. A shoe print found inside the kitchen was also believed to have been left by the killer.

36.     Several witnesses gave descriptions of a car they saw in the driveway of E.P.'s house that appeared to have belonged to the perpetrator, indicating that it was a medium-sized car with a round roof, shiny top, two-foot long tail light, round headlights, and a yellow lens park light.

37.     Thus, shortly after the crime, Defendants knew the E.P. murder had been committed by a single bushy-haired African-American man and had at least a shoe print and possibly a fingerprint he had left at the scene. They also had a description of the distinctive car the killer drove along with a tire impression it had left in the driveway.

They had a description of the missing murder weapon (an 8-inch silver blade) and they knew that a towel—which presumably would have been covered in blood—had been taken by the killer from E.P.'s home.

### Defendants Arbitrarily Question and Arrest Other Young African-American Men for the Crime

38.     Beginning just hours after the murder and continuing for days following the murder, officers, including Defendants, improperly detained and aggressively questioned numerous African-American men about E.P.'s murder.  When officers falsely arrested two African-American teenagers for the crime, one officer put a gun to the head of one of the teenagers and said "we got that nigger now."

39.     Despite such intimidation tactics, Defendants were unable to obtain a confession from any of these suspects.  Soon, Defendants began focusing exclusively on a different suspect: Larry Ruffin.

### Defendants Target Larry Ruffin

40.     On the night of May 4, 1979, Larry Ruffin, an African-American 19-year-old from Eastabuchie, a small community near Eatonville, received a pass to leave the Restitution Center in downtown Hattiesburg; he had been remanded there for a minor theft from a friend's father's gas station.  Mr. Ruffin went with his girlfriend Kathleen Strong—who was the mother of his young daughter Nikki and was pregnant with his second daughter Carrie—to the house of Lou Etta Roberts.  He arrived at Roberts's house, where he saw several friends and family. Just before 10 pm, Mr. Ruffin, John Barnes, and Roberts left the house to go to Brooks Bar about a mile up the road.  Brooks Bar was largely frequented by young black men and women.

41.     On the night of May 4, 1979, Mr. Ruffin gambled in the pool house at Brooks Bar

and was seen by many of the bars' patrons.  Along with many other customers, Mr. Ruffin left Brooks Bar in a hurry at about midnight when word went around that the police had arrived to break up the gambling; as it turned out, the police had actually arrived in connection with the E.P. murder investigation, although they had no specific information connecting Brooks Bar or its customers to the crime.  Officers told the manager to close the bar and began to clear the customers out and send them home.  Mr. Ruffin returned to Roberts's house and played cards for several more hours.  Mr. Ruffin then spent the night with Strong at her uncle Bennie White's house, which was Strong's primary residence.

42.    When Mr. Ruffin returned to the Restitution Center on May 5th, he was confronted about his whereabouts the night before.  Mr. Ruffin truthfully reported where he had been.

43.    Despite the lack of evidence implicating Mr. Ruffin, Defendants had decided before picking Mr. Ruffin up that day that Mr. Ruffin was a good suspect for the E.P. rape and murder.  Mr. Ruffin, a teenager who could not read well and had no powerful connections in the community, was an easy target.

44.    Immediately upon his return to the Restitution Center, Defendants threatened to physically assault and even kill Ruffin.  For example, law enforcement officials including Defendant Sheriff's Deputy Larry James and Director of the Restitution Center Billie Wallace drove Mr. Ruffin in a police car around the Kelly Settlement on May 5th, purportedly to confirm Mr. Ruffin's story about his whereabouts when he was out on his pass the previous night.  When Mr. Ruffin's friends and family members confirmed his story, Defendant James then said, loudly enough for Mr. Ruffin to hear, "Why don't we

just take him to the woods and kill him?"  James and Wallace then drove Mr. Ruffin to

Brooks Bar, where Ernest Brooks, the owner of Brooks Bar, confirmed that Mr. Ruffin

had been at his bar on the night in question.  James and Wallace then brought Mr. Ruffin

to the Forrest County Regional Jail Complex.   Defendants detained him there for two

days before returning him to the Restitution Center.

### Restitution Center Inmates Questioned

45.     Soon after the murder, Defendants began questioning inmates at the Restitution

Center about Mr. Ruffin's whereabouts on the night of the murder.  Some inmates

truthfully stated that Mr. Ruffin was with them at Brooks Bar on the night of the murder

and therefore could not have committed the crime.  The inmates were told that they had

better keep their mouths shut about this alibi evidence or they would not be let out of the

Restitution Center any time soon.

### Fabricated Statements Lead to Mr. Ruffin's Arrest

46.     On May 29th, nearly a month after E.P.'s murder, Andy DeFatta, who was the

cousin of Defendant Forrest County Sheriff's Deputy Eddie Clark and an inmate at the

Restitution Center, purportedly volunteered to Deputy Clark that Mr. Ruffin had

confessed to DeFatta that Mr. Ruffin had committed the murder.  Clark brought DeFatta

to the jail to give a statement to Defendants FCSD Chief Criminal Deputy Sheriff Joe

Hopstein, Deputy Sheriff Terry Martin, and Chief DA Investigator Arlon Moulds.

47.     The statement signed by DeFatta falsely stated that Mr. Ruffin told DeFatta on

May 4 that he was going to "cut somebody" that night and that he "really wanted a white

woman," and claimed that, on the morning of May 29th, Mr. Ruffin confessed the crime

to him. Shortly after DeFatta signed this statement, Defendants Chief Criminal Deputy

Hopstein, Chief DA Investigator Moulds, and Deputy Martin, along with other officers, took a statement from another Restitution Center inmate, Harold Christopher "Cris" Williams, which said that the morning before the crime, Mr. Ruffin told Williams that he was going to "cut someone's throat."

48.    These statements were fabrications.  Mr. Ruffin was completely innocent of any involvement in the E.P. rape and murder.  He never said these things, or anything like them, to DeFatta, Williams, or anyone else.  Upon information and belief, Defendants pressured DeFatta and Williams to fabricate these statements and/or knew or should have known they were unreliable.

49.    While these statements were being taken on May 29th, Defendants began searching for Mr. Ruffin, who had left the Restitution Center on a pass in order to visit his daughter Nikki.  Late on the night of May 29th, Defendant Moulds and Defendant HPD Investigator Raymond Howell found Mr. Ruffin at his girlfriend Kathleen Strong's uncle's home with Kathleen Strong and their daughter Nikki, arrested him, and brought him to the police station for questioning.

**Officers Coerce Mr. Ruffin's Confession Using Violence and Racial Threats**

50.    Throughout the night of May 29th and into the early morning hours of May 30th, Sheriff's deputies and police officers, including but not limited to Defendants Chief Criminal Deputy Hopstein, Sheriff's Deputy and Chief Jailer Herbert Hart, Deputies Brown, Clark and Martin, Officer Howell, and Chief DA Investigator Moulds, acting in concert, beat, punched, kicked, slapped, and hurled racial slurs and death threats at Larry Ruffin, demanding that he confess to the crime.  They denied him food and sleep.  They moved him from one room to the next in the jail, passing him back and forth between

14

different abusers, telling him that if he did not confess he would die.

51.     A list of the violent acts and threats inflicted on Mr. Ruffin before he confessed

includes, but is in no way limited to, the following:

       a.     Defendant Clark caught Mr. Ruffin by his hair, pulled him out of the

chair and put his foot in Mr. Ruffin's chest, loosened his gun buckle and said,

"I don't like niggers anyway, I'll kill you."

       b.     Defendant Clark took a pool stick from the corner of the room and hit

Mr. Ruffin across the back with it.

       c.     Defendant Clark hit Mr. Ruffin across the face with a folded towel.

       d.     Defendant Chief Criminal Deputy Hopstein said in Mr. Ruffin's hearing

that officers ought to take Mr. Ruffin up on top of the roof and kill him and

claim that he had tried to escape.

       e.     Defendant Deputy Brown punched Mr. Ruffin in the face with his fist

and said Mr. Ruffin was lying when he denied the crime, while Defendant

Chief Criminal Deputy Hopstein was standing in the room.

       f.     Defendant Deputy Brown slapped Mr. Ruffin in the face. Mr. Ruffin

asked Defendant Chief Criminal Deputy Hopstein to let him spit in a cup

because he had blood in his mouth.

       g.     Mr. Ruffin was lying on the floor screaming after these assaults, so

Defendants moved Mr. Ruffin to the second floor of the jail.  Mr. Ruffin

believed that he was moved so that it would be harder to hear his screams.

       h.     Defendant Deputy Brown stood next to Mr. Ruffin and menacingly

cleaned his fingernails with a knife while questioning him.

      i.     Defendants Deputy Brown and Deputy Clark assaulted Mr. Ruffin, and then withdrew and left Defendant Chief Criminal Deputy Hopstein and Mr. Ruffin alone.  Defendant Chief Criminal Deputy Hopstein told Mr. Ruffin that if he did not answer his questions to Hopstein's satisfaction, Hopstein would get Defendants Deputy Brown and Deputy Clark back in the room.

52.     As a result of these and other assaults, Mr. Ruffin suffered several visible injuries, including severe swelling and bruising of his face.  Mr. Ruffin also suffered pain in his chest for about two months after the initial assaults.

53.     Mr. Ruffin was scared and nervous and believed Defendants when they said that they would kill him.

54.     After at least 7 hours of violently beating, threatening, and abusing Mr. Ruffin through the night, Defendants finally secured a coerced and fabricated confession from Mr. Ruffin in the early morning hours of May 30th.

55.     The physical violence and threats did not cease after Defendants had extracted the first coerced confession from Mr. Ruffin.  Mr. Ruffin continued to suffer constant abuse at the hands of Defendants, including, but in no way limited to, the following:

      a.     Defendant Deputy Brown sat Mr. Ruffin in a chair with handcuffs behind his back.  Defendant Deputy Brown put a wristwatch on the table, and told Mr. Ruffin that he had five minutes to tell the police what they wanted to hear or he would break open Mr. Ruffin's head with a pool stick.

      b.     Every night for many days, an officer would approach Mr. Ruffin's cell to say that Mr. Ruffin had a "telephone call."  Officers, including Defendants Guards Erwin and Taylor would then take Mr. Ruffin downstairs, beat him,

and return him to his cell.  This practice ceased only when other inmates stood

together and demanded to be taken downstairs with Mr. Ruffin for his

"telephone call."

c.      Defendants Guards Erwin and Taylor beat Mr. Ruffin to the ground in

the hallway by the elevators as he was being transferred between his cell and

the interrogation rooms.

d.      Upon information and belief, Defendants also ordered jail trustees to

beat Mr. Ruffin.  In exchange for conducting those beatings, the trustees

would receive extra privileges.

e.      Several inmates witnessed the beatings by jail guards and trustees.

Defendants threatened those witnesses with sanctions if those inmates told

anyone about the beatings they had witnessed.

56.    Mr. Ruffin was completely innocent of any involvement in the E.P. rape and

murder.  He had no connection to true perpetrator Andrew Harris.  He never would have

falsely confessed if it had not been for Defendants' misconduct.

### Defendants Fabricate Incriminating Details to Bolster an Unreliable Confession

57.    Given both the coercive means used to obtain the confession and Mr. Ruffin's

inability to provide any verifiable, nonpublic information about the crime, the

unreliability of the confession should have been readily apparent to Defendants.

58.    Mr. Ruffin's statement includes the following details about the crime that

matched the evidence gathered by the officers: the perpetrator drove a car into the

driveway, he was wearing tennis shoes, he raped the victim and cut her throat, E.P. was

wearing a nightgown, the victim's young son witnessed the murder, and the perpetrator

took a towel from the kitchen that he used to wipe off the knife.

59.     According to the officers' version of events, Mr. Ruffin also voluntarily drew a detailed diagram of E.P.'s home for Defendant Deputy Brown that correctly showed the layout of the bedroom, bathroom, kitchen, and children's room, and showed that the back of the house had three sliding doors.  Officers provided this diagram to the prosecutors and represented that Mr. Ruffin had drawn the diagram of his own volition with no assistance.  Officers told prosecutors that Mr. Ruffin drew *three doors* in his diagram, a nonpublic fact that only the true perpetrator would have known.

60.     Mr. Ruffin, who was innocent and had no connection to the true perpetrator, was not the origin of the nonpublic information in his confession or in the diagram of E.P.'s house.  Not only was Mr. Ruffin innocent, but he had never met E.P. and had never been to her house prior to the investigation, and thus he had no pre-investigation knowledge of the layout of her house.  Mr. Ruffin only signed the confession and drew the diagram in order to stop Defendants from assaulting him and because he feared for his life. Defendants gave the facts of the crime and details about the house to Mr. Ruffin prior to his confession and drawing of the diagram in order to make the confession appear more credible, and they beat and threatened him until he adopted the facts that they gave him. Defendants then represented to the prosecutors that these facts originated with Mr. Ruffin, thereby falsely suggesting that the confession was reliable when in fact all of the incriminating information came from Defendants.

61.     In response to Defendants' coercion, including the violence and threats of violence detailed above, Mr. Ruffin answered Defendants' insistent questions about other details of the crime, such as the type of car he allegedly drove, and what he had

supposedly done with the knife.  Because Mr. Ruffin was innocent and had no nonpublic

knowledge about the crime, these additional details provided by Mr. Ruffin were all false

and could not be corroborated.

62.     Defendants knew or should have known that the few key details of the

"confession" that originated with Mr. Ruffin, which Mr. Ruffin only stated as a result of

Defendants' coercion, were false.  For example, Mr. Ruffin's confession stated that he

left the knife in a friend's car; Defendants searched the car and could not find it; they

then returned to Mr. Ruffin and under coercive threats demanded additional statements

about the location of the knife, all of which proved equally inaccurate.  Mr. Ruffin's

confession stated that he had left the towel at Roberts's house, but it was not found there,

and additional stories beaten out of Mr. Ruffin about the location of the towel also proved

to be inaccurate.

63.     Additionally, and despite the complete lack of evidence corroborating the

confession, Defendants made no legitimate attempt to verify other purported facts that

originated with Mr. Ruffin and would not have been difficult to check.   Upon

information and belief, Defendants failed to investigate these details because they knew

or suspected that investigation would establish that these details, too, were false.  For

example, Mr. Ruffin's confession included the statement that Mr. Ruffin had used a blue

Ford that he borrowed from a friend at Brooks Bar; the police never attempted to locate

this car.  The confession stated that Mr. Ruffin had worn tennis shoes borrowed from his

friend Jessie White during the crime; officers never questioned White about his shoes or

attempted to inspect them.  No shoes matching the killer's footprint were ever recovered.

64.     On June 12, 1979, after another beating from officers including Defendants

Deputy Brown and Deputy Clark, Mr. Ruffin gave a second confession.  As with the first

confession, this second confession was a false confession that Mr. Ruffin gave only

because of Defendants' coercion.  Mr. Ruffin believed that officers including Defendants

Deputy Brown and Deputy Clark would attack him again if he did not sign the statement.

Mr. Ruffin was innocent and had no nonpublic knowledge about the crime.  Therefore,

any details that Mr. Ruffin volunteered himself were false and could not be corroborated.

Once again, the police could not find the towel, knife, or shoes in the places that Mr.

Ruffin stated that he had left them.

65.     On July 3, officers including Defendant Moulds took Mr. Ruffin to E.P.'s house

and falsely reported to the prosecutors that Mr. Ruffin was able to direct the police car to

E.P.'s house without their assistance.  This was a misrepresentation.  In fact, as the

Defendants knew or should have known, several officers, including Defendant Chief

Criminal Deputy Hopstein, had previously taken Mr. Ruffin to the crime scene. During

that initial trip, Defendants had shown Mr. Ruffin where the house was.

66.     In sum, Defendants coerced and fabricated three written statements and numerous

oral statements from Mr. Ruffin containing nonpublic information about the crime as

well as a diagram of the crime scene containing nonpublic information about, among

other things, the location of the rooms in the house and the number of screen doors at the

back.  They misrepresented to prosecutors, orally and in writing, that this information

originated with Mr. Ruffin.  Accordingly, even though none of the evidence collected at

the crime scene could be matched to Mr. Ruffin, and some of it clearly pointed away

from Mr. Ruffin, the prosecution was able to proceed based on the coerced and fabricated

evidence.  Throughout, Defendants ignored or contorted the evidence to fit their baseless

theory that Mr. Ruffin was the real perpetrator.  Moreover, Defendants threatened

prisoners with sanctions if those prisoners reported or testified to the physical abuse that

those prisoners had witnessed Defendants perpetrating on Mr. Ruffin.

67.     Based on the alleged confession, Mr. Ruffin was charged on May 30, 1979, and

was indicted on August 2, 1979.

> **Defendants Utilize Improper Identification Procedures and Fail to Investigate Andrew Harris**

68.     In addition to the many indications that all evidence inculpating Mr. Ruffin was

false or unreliable, and that the forensic and eyewitness accounts pointed away from him

as the perpetrator, Defendants had additional reason to know that Mr. Ruffin was

innocent.  In particular, during their investigation, true perpetrator Andrew Harris's name

was provided to Defendants by a credible source as a potential suspect for the murder.

Defendants, who were focused on the innocent Mr. Ruffin, either failed to investigate

Harris or suppressed the information they obtained from that investigation.

69.     Defendants also utilized unduly suggestive and otherwise improper identification

procedures involving Mr. Ruffin that violated minimally acceptable police practices, and

they failed to disclose the fact of these procedures or the exculpatory results to

prosecutors, the defense, or the court.

70.     Indeed, by the time of or soon after Mr. Ruffin's arrest, Defendants knew that Mr.

Ruffin did not match the few pieces of information that they possessed about the real

killer.  Defendants knew that he was not bushy-haired as L.P. had described the killer—to

the contrary, Mr. Ruffin had short hair.   Moreover, Defendants also soon determined that

Mr. Ruffin did not own a pair of tennis shoes that matched the shoe print found in the

kitchen.  Defendants also determined that Mr. Ruffin did not match the latent fingerprint

left at the crime scene that had not been matched to members of E.P.'s family.  They

knew that he did not own a car or have access to an unusual car matching the descriptions

given by witnesses at the crime scene.

### Mr. Ruffin's Family Was Violently Harassed and Attacked with Racial Slurs

71.     Following Larry Ruffin's arrest, the large Ruffin family—Larry Ruffin had eleven

brothers and sisters—suffered frequent and violent harassment.  Upon information and

belief, some Defendants directly participated in, and/or knew about and failed to stop, the

violence.

72.     Ruffin family members were regularly harassed by aggressive telephone callers

who made threats and said things like "That murderer Larry Ruffin took that mother from

her children."  The family received calls day and night.

73.     In the summer of 1979, the NAACP held a church meeting to raise money for Mr.

Ruffin's legal representation and invited the whole community.  During the meeting, an

unidentified person called the church and threatened to "bomb that church out where you

niggers is."  The church's power was cut during that meeting.

74.     Mr. Ruffin's sisters required escorts on their way to and from work because they

were afraid they would be attacked.

75.     The trailer where Oliver Ruffin was living with Kathleen Strong and Larry

Ruffin's two young daughters (Nikki Smith and Carrie Strong) was set on fire and

destroyed.  Officers refused to investigate, saying that it was an accidental fire, but there

was no evidence of an accidental cause.

### Police Arrest Mr. Dixon and Mr. Bivens and Coerce and Fabricate their Confessions

76.     As trial approached, the weakness of the prosecution case became apparent.  The

confession was completely uncorroborated, Mr. Ruffin was willing to testify to the physical abuse and other coercion that had led him to falsely confess, and he had other witnesses to confirm his testimony.  Defendants' efforts to verify the details that Mr. Ruffin had provided repeatedly demonstrated that Mr. Ruffin had no nonpublic information about the crime—because he was innocent.  Defendants needed additional evidence to support Mr. Ruffin's prosecution.

77.     For sixteen months after the crime there had been no indication that there may have been more than one perpetrator.  L.P., the only eyewitness to the crime, repeatedly stated to law enforcement officials and others that one and only one man had attacked his mother (saying, for example, "a black man hurt my mommy," and "there was one boy and he was bad"), and the evidence at the crime scene pointed to a single perpetrator rape.  Mr. Ruffin's coerced and fabricated confession stated that Mr. Ruffin had committed the crime alone.  Nevertheless, in the absence of any other evidence to shore up Mr. Ruffin's prosecution, in September and October of 1980, Defendants arrested Bobby Ray Dixon and Phillip Bivens as Mr. Ruffin's purported accomplices.  Although there was no evidence to tie Mr. Dixon and Mr. Bivens to the crime, Defendants then beat, threatened and otherwise coerced Mr. Dixon and Mr. Bivens into falsely confessing. Defendants then coerced Mr. Dixon and Mr. Bivens into pleading guilty in exchange for sentences of life in prison on the condition that they testify against Mr. Ruffin at Mr. Ruffin's upcoming trial.

*Mr. Dixon*

78.     Bobby Ray Dixon was a mentally handicapped acquaintance of Mr. Ruffin who had been kicked in the head by a horse when he was a child.  He was easily led, unable to

understand complex information, had little appreciation for legal consequences, and was illiterate.

79.     Mr. Dixon was arrested in September of 1980 on a trumped up charge of missing a work detail in connection with a prior minor conviction.  Upon information and belief, Defendants sought out Mr. Dixon for arrest because he had previously been arrested, along with Mr. Ruffin, for the minor gas station theft that had led to Mr. Ruffin's sentence at the Restitution Center.

80.     Once in custody, Mr. Dixon was subject to numerous beatings in jail, during which Defendants pressured him to confess.  Defendants told him that he would go to the gas chamber if he did not admit that he watched Mr. Ruffin commit the crime.  On one occasion, he was thrown against a table and had a seizure as a result.

81.     On October 3, 1980, Mr. Dixon initially gave a statement truthfully denying any involvement in the crime.  That statement was not preserved.  Mr. Dixon was threatened with a beating if he did not give a videotaped statement that conformed to what Defendants wanted him to say.   Mr. Dixon finally succumbed to the abuse and threats of violence later that same day and gave a statement, this time videotaped, to Defendant Moulds and six others, in which he falsely implicated himself, Mr. Ruffin, and a third man who was also completely innocent, Phillip Bivens.

82.     Mr. Dixon was completely innocent of any involvement in the E.P. rape and murder.  He had no connection to true perpetrator Andrew Harris.  He never would have falsely confessed, and falsely implicated Mr. Ruffin and Mr. Bivens, if it had not been for Defendants' misconduct.

83.     In his confused, uncertain, and inconsistent statement, Mr. Dixon "confessed" to

being an accomplice in the crime and stated that Mr. Bivens cut E.P.'s throat.  Although Mr. Dixon was innocent and did not have any nonpublic information about the crime, his statement included key facts about the crime, including that E.P. was raped in the back room, that she was wearing a gown, that her throat and stomach were cut, and that a four-year old child was screaming in the room.  These facts did not originate with Mr. Dixon, as was falsely represented on the videotape and at trial, but in fact originated with Defendants.

84.    There were obvious deficiencies in Mr. Dixon's confession and the evidence against him.  For example, Mr. Dixon stated that Mr. Ruffin was older than Mr. Bivens, even though Mr. Bivens was almost ten years older than Mr. Ruffin.  Mr. Dixon also stated that he was "way older" than Mr. Bivens, even though Mr. Dixon was actually six years younger than Mr. Bivens.  Moreover, during the taped confession, Mr. Dixon identified a bag of clothes produced by officers as bloody clothes discarded by Mr. Bivens, when they were not.  Mr. Dixon's mental functioning was so limited that he was in no position to resist the pressure by Defendants to say what they wanted him to say, even though the physical evidence in the room in front of him on camera did not match the story he was telling.

85.    Following the coerced and fabricated confession, Mr. Dixon was returned to his cell.  He suffered numerous beatings at the hands of Defendants over the next several weeks, and was also told that if he did not plead guilty in a manner consistent with his confession he would be put to death.

86.    Mr. Dixon, terrified and confused by his situation, pleaded guilty on October 22, 1980, only nineteen days after his fabricated and coerced confession, and was sentenced

to life in prison on the condition that he would testify against Mr. Ruffin at trial.

*Mr. Bivens*

87.     Phillip Bivens was a native of California who had traveled to Hattiesburg in the fall of 1978 to help his brother start a farm.  Mr. Bivens, who was reluctant to travel to Mississippi at all, planned to stay for only a short time while helping his brother and then return home.  Mr. Bivens worked in a local factory and helped his brother, whose wife was related to Mr. Ruffin's girlfriend.

88.     At the time of the murder, Mr. Bivens was living on his brother's farm just outside of Hattiesburg.  As he had planned, Mr. Bivens returned to Fresno, California in the summer of 1979.  In Fresno, Mr. Bivens lived with his mother, got a good job at a local factory, and planned to get married to his girlfriend.

89.     Mr. Bivens's calm was shattered when, in October 1980, more than a year after he had left Mississippi behind, he answered the door to law enforcement officers.  They asked if Mr. Bivens knew Larry Ruffin, to which Mr. Bivens truthfully responded that he had met him but did not know him well.  They asked if Mr. Bivens knew Bobby Ray Dixon; Mr. Bivens truthfully responded that he did not.  Then the officers told Mr. Bivens he was under arrest for the murder of E.P.  Protesting that he had no idea what they were talking about, Mr. Bivens was taken into custody.

90.     Mr. Bivens was taken on a small plane bound for Mississippi, accompanied by Defendant Deputy and Chief Jailer Hart and other officials.  During the flight, the officers came back to where Mr. Bivens was sitting and accused him of the crime, which he truthfully denied.  The officers told him that he was lying and that Mr. Ruffin and Mr. Dixon had already implicated him.  Mr. Bivens was terrified that he would not even make

26

it to the jail alive.

91.     Shortly after Mr. Bivens arrived at the Hattiesburg jail, Defendant Sheriff Walters approached his cell with a knife in his hand.  The Sheriff said to Mr. Bivens words to the effect of, "You niggers come down here from California and think you can kill a white woman and get away with it.  Something should be done to you."  Mr. Bivens was terrified and pressed himself to the back of his cell to keep his distance.

92.     Early in his incarceration, Mr. Bivens learned about the pattern of intimidation surrounding the prosecution in this case and Mr. Ruffin's severe and repeated beatings by Defendants. He felt threatened and intimidated by Defendants.  He was sure that he would be killed in the jail.

93.     Defendants questioned Mr. Bivens without a lawyer present.  Mr. Bivens was shown photographs of the victim and told what color underwear E.P. was wearing.  He was also told that Mr. Ruffin and Mr. Dixon had implicated him and he was informed, falsely, that police had found a pair of Levi's with blood on them in his size.  Mr. Bivens denied that these jeans were his and stated truthfully that he was innocent.

94.     Defendants told Mr. Bivens that if he did not confess and continued to protest his innocence, he would be executed in the gas chamber.  Terrified by what might happen to him if he stayed in the Hattiesburg Jail, on November 1, 1980, Mr. Bivens agreed to confess and plead guilty despite his innocence.  A few hours later, several people including Defendants Hopstein and Moulds assembled to take Mr. Bivens's videotaped confession.

95.     Mr. Bivens was completely innocent of any involvement in the E.P. rape and murder.  He had no connection to true perpetrator Andrew Harris.  He never would have

falsely confessed, and falsely implicated Mr. Ruffin and Mr. Dixon, if it had not been for Defendants' misconduct.

96.     Mr. Bivens's coerced and fabricated confession included facts given to him by Defendants, who had shown him crime scene photographs of the victim with her throat cut, and who asked suggestive questions such as "how did you feel about a kid witnessing the crime?"  In this coerced and fabricated confession, Mr. Bivens stated that at about 10 or 11 at night, he, Mr. Dixon and Mr. Ruffin broke into E.P.'s house and demanded money, that Mr. Ruffin raped E.P. and cut her throat , and that he, Mr. Dixon, and Mr. Ruffin fled the scene when a small child started screaming.

97.     Still intimidated by Defendants' threats, Mr. Bivens pleaded guilty to the murder on November 4, 1980, only three days after his coerced and fabricated confession.  On that same day, Mr. Bivens was sentenced to life in prison on the condition that he agree to testify against Mr. Ruffin.

**The Trial**

98.     The trial of Larry Ruffin began on Monday, December 1, 1980, and lasted for one week.

99.     Due to immense public pressure surrounding the trial in Hattiesburg, proceedings were moved to Gulfport, MS.  During each day of the trial, large crowds gathered outside the courthouse.

100.     During the trial, Mr. Ruffin's mother received a call from an unidentified person who said "that nigger killed that white woman and we're going to break into jail and get him."

101.     Mr. Ruffin's family members were warned that if Mr. Ruffin was not convicted at

trial, he would be lynched.

102.    In this coercive mob atmosphere, Mr. Dixon and Mr. Bivens testified against Mr. Ruffin at trial, and their videotaped confessions were also played for the jury.

103.    During his testimony, Mr. Bivens became confused about who had supposedly cut E.P.'s throat. Mr. Bivens twice stated that Mr. Dixon cut E.P.'s throat, but each time he then changed his statement and said that Mr. Ruffin had cut E.P.'s throat.

104.    Mr. Dixon's testimony was not consistent with his prior statement. Although Mr. Dixon's confession stated that Mr. Bivens had cut E.P.'s throat, Mr. Dixon testified at trial that it was actually Mr. Ruffin who had cut E.P.'s throat. Mr. Dixon was confused by the questioning, stating at one point that he did not understand the meaning of the words "under oath." Mr. Dixon further stated that he was testifying in the hopes of reducing his sentence. After testifying on direct examination and cross-examination that he committed the crime with Mr. Ruffin and Mr. Bivens, Mr. Dixon recanted on re-direct, stating that he had not ever seen E.P., he was not involved in the murder, he had not seen Mr. Ruffin or Mr. Dixon on the night of May 4, 1979, and he did not want an innocent Mr. Ruffin to go to jail. Mr. Dixon stated that his previous confessions were not "free and voluntary. I don't have the right mind, which my mind comes and goes, and I don't like to see nobody took away for nothing they ain't done."

105.    Mr. Ruffin truthfully testified that he was innocent and to his alibi. He described how he was severely beaten and threatened in jail on many occasions, how officers fed him information about the crime, and how he had only signed the confession because he was afraid.

106.    Nevertheless, based on the coerced and fabricated signed confession from Mr.

Ruffin, as well as the coerced and fabricated statements from Mr. Bivens and Mr. Dixon,
Mr. Ruffin was convicted on Friday, December 5, 1980.  After the jury deadlocked
during the capital penalty phase, the judge sentenced Mr. Ruffin to a term of life
imprisonment on that same evening, December 5.

107.    Soon thereafter, Larry Ruffin's brother James Ruffin's house was burned to the
ground.

### Mr. Ruffin's, Mr. Dixon's, and Mr. Bivens's Repeated Attempts to Prove Their Innocence

108.    Throughout his incarceration, Larry Ruffin and his family members continued to
advocate for his release.   These attempts were made more difficult because the original
police file and transcripts of Mr. Dixon's and Mr. Bivens's pleas were reported as lost.
Mr. Ruffin filed an appeal from his conviction, but it was denied by the Supreme Court of
Mississippi.

109.    Mr. Bivens's petition for post-conviction relief was denied on May 18, 1982.

110.    Mr. Dixon filed multiple petitions for post-conviction relief, all of which were
denied.

111.    Mr. Ruffin, Mr. Bivens, and Mr. Dixon each came up for parole numerous times
but parole was always denied.

112.    Defendants were aware of the Wrongfully Convicted Plaintiffs' post-conviction
appeals and parole applications and the basis for them.

113.    The individual Defendants affirmatively concealed or otherwise failed to come
forward with the truth about their own unconstitutional conduct in connection with the
investigation, the coerced confessions, and the trial, despite the fact that this evidence
could have been used at any time to demonstrate that Mr. Ruffin, Mr. Dixon, and Mr.

Bivens were innocent and to secure their release on parole.

114.    In their supervisory capacities, Defendants Walters, Hopstein, Hart, Moulds, and John Doe Supervisors failed to expose and remedy the unconstitutional conduct of their subordinates, about which they knew or should have known.  If the supervisory Defendants had remedied this unconstitutional conduct, it would have led to the demonstration of Mr. Ruffin's, Mr. Dixon's, and Mr. Bivens's innocence.

### The Real Killer is Identified and Mr. Ruffin, Mr. Dixon and Mr. Bivens are Exonerated

115.    In 2008, Bobby Ray Dixon contacted the Innocence Project New Orleans, which began the process of obtaining and testing the preserved crime scene DNA.

116.    In 2010, DNA testing of the sperm from E.P.'s rape kit performed at the Orchid Cellmark Laboratory produced a single male DNA profile from the cotton swatch taken from the vaginal area of E.P.  The profile was sent to the Mississippi Crime Lab, which matched that profile to Andrew Harris and thus also excluded Mr. Ruffin, Mr. Dixon and Mr. Bivens as the source of the DNA profile.  At that time, Harris was serving a life sentence for another brutal rape that he, acting alone, had committed in Forrest County shortly after the E.P. rape and murder.  Harris lived near E.P.'s home in 1979 and worked with E.P.'s father-in-law.  Astonishingly, Defendants had been provided with Harris's name as a potential suspect early on in the E.P. murder investigation by a reliable source, but had either failed to follow up on this lead and/or had suppressed the exculpatory information they uncovered about the Wrongfully Convicted Plaintiffs.

117.    Based on the DNA results, counsel for Mr. Ruffin, Mr. Dixon, and Mr. Bivens petitioned the court to vacate their convictions pursuant to Mississippi Code Annotated § 99-39-5.

31

118.    As part of this petition, the state of Mississippi stipulated to certain facts about Mr. Ruffin, Mr. Dixon, and Mr. Bivens, including that "No physical or forensic evidence or independent eyewitnesses connected Larry Ruffin, Bobby Ray Dixon, or Phillip Bivens to the crime scene except statements and testimony each of them gave."

119.    In August of 2010, Mr. Dixon, who had lung cancer, was granted medical parole based on the exonerating DNA evidence.

120.    On September 16, 2010, Mr. Dixon and Mr. Bivens's petitions to overturn their convictions were granted.  Mr. Bivens was released on bail that day.   Mr. Ruffin's petition proceeded on a separate schedule because he was deceased.

121.    Mr. Bivens, Mr. Dixon, and Mr. Ruffin were exonerated on December 14, 2010, when a Hattiesburg grand jury declined to indict the three men.  On that same day, the grand jury indicted Andrew Harris for the rape and murder of E.P.  Mr. Dixon had died of lung cancer only five weeks before he was officially exonerated.

122.    On February 18, 2011, a Mississippi judge also signed an order posthumously exonerating Mr. Ruffin and declaring him innocent.

123.    Larry Ruffin, Phillip Bivens, and Bobby Ray Dixon did not know Andrew Harris at the time of the murder.  Andrew Harris signed a sworn statement in 2010 stating that he did not know Larry Ruffin, Phillip Bivens, or Bobby Ray Dixon before he went to prison.

**Defendants' Continue Their Unlawful and Unconstitutional Conduct**

124.    In each and every year of Mr. Ruffin's, Mr. Bivens's and Mr. Dixon's combined 83 years of wrongful incarceration, from 1979 to 2010, Defendants breached their legal and constitutional duties to remedy the dangerous situation they created for Plaintiffs and

to come forward with evidence of the Wrongfully Convicted Plaintiffs' innocence.  If Defendants had been truthful about their conduct, Mr. Ruffin, Mr. Bivens, and Mr. Dixon would never have been arrested, detained, and coerced into confessing; Mr. Bivens and Mr. Dixon would never have pleaded guilty and spent decades in prison for a crime they did not commit; Mr. Ruffin would never have been tried, convicted, and spent decades in prison for a crime he did not commit; and Nikki and Carrie would never have been deprived of a relationship with their father.  Even after their arrests and convictions, Mr. Ruffin, Mr. Bivens, and Mr. Dixon all could have used the information possessed by Defendants in post-conviction motions for relief and petitions for parole.  Instead, each time Mr. Ruffin, Mr. Dixon and Mr. Bivens came up for parole, Defendants said nothing as many people signed petitions opposing their release and the parole board denied the petitions.

125.    In so doing, Defendants violated their clearly established and ongoing legal and constitutional duties and affirmative obligations to come forward in each and every year of Plaintiffs' ordeal, starting with Mr. Ruffin's arrest and though the exonerations of Mr. Ruffin, Mr. Dixon, and Mr. Bivens, specifically including in 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010, which conduct actually and proximately caused Mr. Ruffin, Mr. Bivens, and Mr. Dixon to suffer and endure false detention and false imprisonment, embarrassment, humiliation, mental and emotional distress, violations of their constitutional rights, personal, physical and other bodily injuries, and the loss of liberty.

### Policies and Customs of the Forrest County Sheriff's Department and Hattiesburg Police Department

126.    Prior to and at the time of the unlawful investigation, prosecution, conviction, and imprisonment of the Wrongfully Convicted Plaintiffs, Forrest County, the FCSD, the City of Hattiesburg and the Hattiesburg Police Department, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b) coercing confessions from defendants through physical attacks, threats, and other coercion; (c) fabricating evidence; (d) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court; (e) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigation; and/or (f) engaging in the affirmative and/or passive concealment of this type of misconduct.

127.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Larry Ruffin, Phillip Bivens, and Bobby Ray Dixon, the HPD and Forrest County Sheriff's Department, by and through final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately train and supervise their officers regarding fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews and documenting and disclosing exculpatory evidence.

128.    The HPD and Sheriff's Department's policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise officers in lawful investigative techniques was reflected in the multiple acts of misconduct and illegality committed by multiple officers and supervisors in relation to multiple suspects and witnesses in the E.P.

34

murder investigation, as described above.

129.    The HPD and Sheriff's Department's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected in numerous prior cases and investigations which, upon information and belief, were known to the HPD and Sheriff's Department supervisors and policymakers prior to the E.P. investigation.  The misconduct committed in those cases by HPD and Sheriff's Department officers, including investigators involved in the E.P. case, was actually or constructively known to HPD and Sheriff's Department supervisors and policymakers prior to the E.P. investigation—including by means of their direct participation in the investigations—and, upon information and belief, HPD and Sheriff's Department supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate HPD and Sheriff's Department investigators in response to such notice.

130.    In addition, Forrest County and the Forrest County Sheriff's Department's final policymaker, Defendant Sheriff Walters, decided to undertake and participate in physically threatening and coercive behavior during the incarceration of Phillip Bivens. For example, shortly after Mr. Bivens arrived at the Hattiesburg jail, Defendant Sheriff Walters approached his cell with a knife in his hand.  The Sheriff said to Mr. Bivens words to the effect of, "You niggers come down here from California and think you can kill a white woman and get away with it.  Something should be done to you."  This single decision by a final policymaker alone demonstrates Forrest County's custom, pattern, practice, or policy of illegal and coercive interrogations.  Through his direct supervision of the interrogations, Defendant Sheriff Walters, as Forrest County and the Forrest County Sheriff's Department's final policymaker, also ratified the unconstitutional

decisions and actions of his subordinates.

**Defendants Intentionally Interfere with Mr. Ruffin's Family Relationship**

131.    Nikki Smith and Carrie Strong are the natural children of Larry Ruffin and Kathleen Strong.  At the time of Mr. Ruffin's arrest, Nikki was approximately one year old, and Kathleen Strong was pregnant with Carrie.

132.    Larry Ruffin was a doting father, and he was deeply engaged in the upbringing and care of Nikki during the first year of her life.

133.    On the night of Mr. Ruffin's arrest, Mr. Ruffin and Ms. Strong were at home with Nikki.  When Defendants Officer Howell and Chief Investigator Moulds entered the home to search for Mr. Ruffin, Mr. Ruffin was at home with his family, including his daughter Nikki.

134.    Defendants arrested Mr. Ruffin and removed him from his home and family and then brought him to the police station for a brutal, coercive interrogation used to elicit a false confession.  In order to further isolate Mr. Ruffin and to prevent his family members from attesting to the mistreatment that he suffered in jail, Defendants intentionally did not allow Mr. Ruffin's family to see him following his arrest.

135.    When the Defendants questioned Kathleen Strong at a later date, she told them that she was pregnant with her second child with Mr. Ruffin.

136.    During Mr. Ruffin's incarceration, he told Kathleen Strong that he was deeply saddened and distressed that he was not able to be a part of his daughters' lives.  Mr. Ruffin cried as he told Kathleen Strong he would never be able to be a proper father for his girls.

137.     As a result of Mr. Ruffin's wrongful arrest and conviction, Nikki and Carrie

suffered deep and pervasive humiliation at school and in public.  They frequently

suffered taunts that their father was a rapist and murderer and that they were worthless

because of their father.

138.     As a result of Mr. Ruffin's wrongful arrest and conviction, Nikki and Carrie were

deprived of an opportunity to associate with their father.  Instead, they were forced to

grow up without their father in their home, with their in-person contact limited to

exhausting visits to the distant prison facility where he was housed.

139.     Despite the fact that Mr. Ruffin was not present in their home growing up, Nikki

and Carrie went to great lengths to stay in communication with him.  When their mother,

Kathleen Strong, moved to New York City, she sent the girls back to Mississippi during

the summers so that they could continue to visit their father.

## DAMAGES

140.     Defendants' actions deprived Plaintiffs Larry Ruffin, Phillip Bivens, and Bobby

Ray Dixon of their civil rights under the First, Fourth, Fifth, Eighth and Fourteenth

Amendments to the United States Constitution.

141.     Defendants' actions deprived Familial Association Plaintiffs Nikki Smith and

Carrie Strong of their rights to familial association under the First and Fourteenth

Amendments to the United States Constitution.

142.     This action seeks damages for the period from May 5, 1979 through each and

every year to the present.  Defendants' unlawful, intentional, willful, deliberately

indifferent, reckless, and racially motivated acts and omissions caused Larry Ruffin,

Phillip Bivens, and Bobby Ray Dixon to be wrongly seized, wrongfully convicted, falsely

imprisoned, subjected to illegal searches and cruel and unusual punishment during the course of their incarceration, and forced to serve decades of prison time for crimes they did not commit, and ultimately led to the untimely deaths of Mr. Ruffin and Mr. Dixon who lived for years in unhealthy conditions and were consistently deprived of necessary medical treatment.

143.    Defendants' unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions caused Larry Ruffin, Phillip Bivens, and Bobby Ray Dixon the following injuries and damages, which were foreseeable to Defendants at the time of their acts and omissions, and which, for Mr. Ruffin and Mr. Dixon, continued to the date of their untimely deaths, and for Mr. Bivens will continue into the future: multiple physical assaults and batteries and other physical injuries, some of which caused permanent disfigurement; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity, loss of income, out-of-pocket legal expenses for appellate representation; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which they are entitled monetary relief.

144.    Larry Ruffin's liberty was curtailed upon his arrest and jailing on May 29, 1979. Bobby Ray Dixon's liberty was curtailed upon his arrest and jailing in September 1980. Phillip Bivens's liberty was curtailed upon his arrest and later forcible removal from

California to Mississippi on an airplane in October of 1980. All three were remanded to Parchman prison upon sentencing.  Mr. Ruffin remained imprisoned until he died, Mr. Dixon remained imprisoned until he was on the verge of death, and Mr. Bivens remained imprisoned until his conviction was vacated.

145.    Larry Ruffin, Phillip Bivens, and Bobby Ray Dixon each suffered the devastating loss of family relationships while in prison.  Mr. Ruffin was the father of two young girls, one not yet born at the time of his arrest.  Phillip Bivens was planning to get married and had a good job in Fresno, California, when he was arrested.  Bobby Ray Dixon was living with his aunt and brother at the time of his arrest and was beloved by his family.

146.    While in prison, Larry Ruffin was denied proper medical treatment for his migraines and high blood pressure.  In 2002, Mr. Ruffin suffered a severe electrical shock while he was in the process of repairing a fan in one of the prison offices after being ordered to do so despite having no training in electrical repair.  He was transported to the prison hospital, where he lay dying for a week.  Mr. Ruffin's family was not notified until the evening he died, when it was too late for them to drive to the prison to see him. Larry Ruffin, greatly beloved by his mother, siblings, children, and nieces and nephews, died alone.

147.    Mr. Dixon also suffered in Parchman prison.  Mr. Dixon suffered from severe seizures.  Instead of providing him with appropriate treatment and care, the officials at Parchman gave him a helmet that he wore at all times so that he would not fall and injure his head during the seizures. While in prison, Mr. Dixon developed lung cancer, which debilitated him.  The substandard medical care available in prison did little to slow its progress.  In August 2010, after DNA results implicated Andrew Harris, Mr. Dixon was

released on a medical parole due to the severity of his medical condition.  Although he walked out of prison in August 2010, the cancer killed him three months after his release, and before he was officially exonerated.

148.    During his thirty-year confinement in prison, Mr. Bivens lived a lonely and stressful existence, surrounded by real rapists and murderers who he feared would attack him.  Moreover, many of Mr. Bivens's close family members passed away while he was in prison.  Mr. Bivens frequently suffered severe and debilitating asthma attacks in prison.  After one such attack, which resulted in his being hospitalized for two weeks, Mr. Bivens returned to Parchman prison to find that the prison doctor was laughing about his condition and stating that it was not serious.  Prison staff members were slow to respond when Mr. Bivens had attacks, which made them worse. While in prison, Mr. Bivens contracted hepatitis, which was not properly treated.  This hepatitis in turn led to a number of medical problems, including liver cancer, which still plague Mr. Bivens to this day.

149.    Defendants' unlawful and intentional acts and omissions caused Nikki Smith and Carrie Strong loss of the companionship and care of their father; pain and suffering; severe mental anguish; humiliation; degradation; emotional distress, and loss of family relationships.

## COUNT I
### Plaintiff Larry Ruffin's 42 U.S.C. § 1983 Claim for Violation of His Rights Against Compelled Self-Incrimination under the Fifth and Fourteenth Amendments

150.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

151.    Defendants, acting individually and in concert, forced Mr. Ruffin to incriminate

himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments not to be a witness against himself.

152.    As described more fully above, the individual Defendants beat, coerced, and otherwise unconstitutionally interrogated Mr. Ruffin, which caused Mr. Ruffin to involuntarily sign false and fabricated statements implicating himself in the rape and murder of E.P.

153.    Specifically, on May 5, 1979, when Defendant James and Restitution Center Director Wallace drove Mr. Ruffin to the jail after questioning his family about his whereabouts, Defendant James stated in Mr. Ruffin's hearing, "Why don't we just take him to the woods and kill him?"  This statement put Mr. Ruffin in fear for his life and clearly demonstrated to him that Defendants would stop at nothing in their quest to hold him responsible for the E.P rape and murder.

154.    A few weeks later, Mr. Ruffin was subjected to a severely coercive interrogation throughout the night of May 29th, 1979, and into the morning of May 30th, 1979, by Defendants, including but not limited to Chief DA Investigator Moulds, Officer Howell, Chief Criminal Deputy Hopstein, Deputy and Chief Jailer Hart, Deputy Brown, Deputy Clark, and Deputy Martin.  Defendants and other officers in their presence and/or acting in concert with them beat, kicked, hit, slapped, and punched Mr. Ruffin, made death threats against him, and denied him food and sleep, which compelled him to make inculpatory statements that, memorialized as a confession, were used against him in the arrest warrant affidavit, the charging instrument, and at trial, in violation of his Fifth Amendment right to be free from compelled self-incrimination.

155.    Following his initial false confession, Mr. Ruffin gave additional inculpatory

statements to Defendants, each following a severe beating or threat of beating by Defendants Brown, Clark, Erwin, Taylor, and others.

156.    Defendants falsely represented to the prosecutor and court that Mr. Ruffin's statements were freely and voluntarily given.

157.    The false statements coerced by Defendants and attributed to Mr. Ruffin were used against Mr. Ruffin to his detriment in a criminal case.   These statements were the reason that Mr. Ruffin was prosecuted and convicted of the murder of E.P.  As the State later stipulated during Mr. Ruffin's exoneration, "[n]o physical or forensic evidence or independent eyewitnesses connected Larry Ruffin, Bobby Ray Dixon, or Phillip Bivens to the crime scene except statements and testimony each of them gave."

158.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would have believed that Defendants' actions were lawful.

159.    As a direct and proximate result of Defendants' actions, Mr. Ruffin was wrongly convicted and imprisoned for twenty-two years until his death in prison and suffered the other grievous injuries and damages set forth above.

## COUNT II
**Plaintiff Larry Ruffin's 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law under the Fourteenth Amendment**

160.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

161.    The individual Defendants, individually and in concert, fabricated evidence, threatened witnesses, and deliberately and/or recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Mr. Ruffin of his right

not to be deprived of liberty without due process of law.

162.    Defendants deliberately and/or recklessly provided Mr. Ruffin with non-public facts about the murder and then fabricated that those details had originated with him.

163.    Specifically, although the individual Defendants knew or should have known that Mr. Ruffin was not involved in the murder of E.P, they educated him about the details of the crime, telling him that the victim was raped and her throat slashed, that she was wearing a nightgown, that the killer drove a car into the driveway, wore tennis shoes, that the killer likely entered from the back of the house, that he used a knife to cut the victim's throat, that he had taken a towel from the kitchen to wipe off the knife after the murder, and that the victim's young child witnessed the murder and began screaming. Mr. Ruffin included all of these details in his first confession.  Defendants drew diagrams to show Mr. Ruffin the layout of the E.P.'s house and then forced him to make his own diagram that reflected information, including the number of doors at the back of the house, which they had given to him and/or knew or should have known that other officers had given to him.  Defendants then falsely represented to the prosecutor, jury, and court that this nonpublic information had originated with Mr. Ruffin.  This fabricated evidence, which made Mr. Ruffin's confession appear to be credible and reliable, contributed to the court's decision not to grant the motion to suppress the confession and was introduced against Mr. Ruffin at trial.

164.    Defendants falsely represented to prosecutors that Mr. Ruffin's statements were in fact freely and voluntarily given, and that Mr. Ruffin had independent knowledge of non-public details of the crime when those details had been provided to him by Defendants and/or were available from public sources.

43

165.    Defendants deliberately and recklessly coerced and/or fabricated allegedly inculpatory statements from purported witnesses including but not limited to Phillip Bivens, Bobby Ray Dixon, Andy DeFatta, and Cris Williams.  Defendants then concealed the misconduct that had produced those statements as well as additional material exculpatory and impeachment evidence, including but not limited to coercive tactics utilized in witness interviews, from prosecutors, defense attorneys and the court.

166.    Defendants also utilized unduly suggestive and otherwise improper identification procedures involving Mr. Ruffin that violated minimally acceptable police practices, and they failed to disclose the fact of these procedures or the exculpatory results to prosecutors, the defense, or the court.

167.    The truth of Defendants' fabrications and the other material, exculpatory and impeachment evidence that was concealed by them could not have been discovered by Mr. Ruffin or his attorneys through the exercise of due diligence.

168.    Had Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been documented and/or disclosed, this evidence would have tended to prove Mr. Ruffin's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of Mr. Bivens and Mr. Dixon. The material exculpatory and impeachment evidence withheld by Defendants, considered individually and collectively, undermines confidence in the verdict against Mr. Ruffin, and the concealment of this evidence deprived Mr. Ruffin of a fair criminal trial.

169.    Defendants also threatened and intimidated witnesses to prevent them from coming forward with alibi evidence and with evidence of the beatings of Larry Ruffin.

170.    Defendants also deliberately and/or recklessly ignored apparent evidence of

44

innocence pointing to other suspects and corroborating Mr. Ruffin's innocence, including but not limited to the following: failing to interview witnesses whose knowledge tended to disprove Mr. Ruffin's guilt; failing to investigate or ignoring evidence regarding Mr. Ruffin's alibi; failing to investigate potential suspects who matched the description given by L.P., the only witness to the crime; failing to investigate exculpatory forensic evidence, including but not limited to shoe print, tire print, and serology evidence; and failing to search for a car matching the distinct characteristics observed by three separate witnesses who were present outside E.P.'s house on the night of the murder.  In fact, this evidence could and should have led Defendants to Andrew Harris, whose name came to investigators early on in the investigation from a reliable source as a potential suspect for the murder.  Defendants' deliberate and/or reckless failure to investigate exculpatory evidence that was known to them, or in the absence of their deliberate and/or reckless indifference should have been known to them, caused Mr. Ruffin to be deprived of his rights under the Fourteenth Amendment.

171.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would have believed that Defendants' actions were lawful.

172.    As a direct and proximate result of Defendants' actions, Mr. Ruffin was wrongly convicted and imprisoned for twenty-two years until his death in prison and suffered the other grievous injuries and damages set forth above.

## COUNT III
### Plaintiff Bobby Ray Dixon's 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Violation of His Rights Against Compelled Self-Incrimination under the Fifth and Fourteenth Amendments

173.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as

follows:

174.    Defendants, acting individually and in concert, forced Mr. Dixon to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

175.    As described more fully above, the individual Defendants beat, coerced, and otherwise unconstitutionally interrogated Mr. Dixon, which caused Mr. Dixon to involuntarily sign false and fabricated statements implicating himself in the rape and murder of E.P.

176.    After arresting Mr. Dixon on a trumped-up charge of missing a Restitution Center work detail, Defendants beat him and threatened him with the death penalty if he did not confess and plead guilty.  Mr. Dixon, who was terrified and completely lacked the mental capacity to understand the consequences of waiving his right to remain silent and his right to a criminal trial, made false incriminating statements that were used against him in the charging instrument, and then pleaded guilty to a crime he did not commit, all as a result of Defendants' coercion and in violation of his Fifth Amendment right to be free from compelled self-incrimination.

177.    When Defendants arrested and interrogated Mr. Dixon more than a year after their interrogation of Mr. Ruffin, Defendants engaged in fabrication in addition to the coercion described above.  Specifically, Defendants told Mr. Dixon what to say in his confession, coaching him to include certain details, such as the fact that a small child witnessed the murder.  This fabricated evidence, which made Mr. Dixon's confession appear to be credible and reliable, contributed to Mr. Dixon's decision to plead guilty rather than risk going to trial.

178.    Defendants also deliberately and/or recklessly ignored apparent evidence of innocence pointing to other suspects and corroborating Mr. Dixon's innocence, including but not limited to the following: ignoring the statement of the only eyewitness to the crime that there was only one perpetrator; failing to interview witnesses whose knowledge tended to disprove Mr. Dixon's guilt; failing to investigate potential suspects who matched the description given by L.P., the only witness to the crime; failing to investigate exculpatory forensic evidence, including but not limited to the shoe print, tire print, and serology evidence; and failing to search for a car matching the distinct characteristics observed by three separate witnesses who were present outside E.P.'s house on the night of the murder.  This evidence could and should have led Defendants to Andrew Harris, whose name came to investigators early on in the investigation from a reliable source as a potential suspect for the murder.

179.    Mr. Dixon's false and coerced incriminating statements were the basis for the charging instrument against him and the plea agreement he signed, in violation of his Fifth Amendment right to be free from compelled self-incrimination.  In fact, as the State later stipulated, "[n]o physical or forensic evidence or independent eyewitnesses connected Larry Ruffin, Bobby Ray Dixon, or Phillip Bivens to the crime scene except statements and testimony each of them gave."

180.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1980 would have believed that Defendants' actions were lawful.

181.    As a direct and proximate result of Defendants' actions, Mr. Dixon was wrongly convicted and imprisoned for thirty years and suffered the other grievous and continuing

injuries and damages set forth above.

## COUNT IV

**Plaintiff Phillip Bivens's 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Violation of His Rights Against Compelled Self-Incrimination under the Fifth and Fourteenth Amendments**

182.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

183.    Defendants, acting individually and in concert, forced Mr. Bivens to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

184.    As described more fully above, the individual Defendants coerced and otherwise unconstitutionally interrogated Mr. Bivens, which caused Mr. Bivens to involuntarily sign false and fabricated statements implicating himself in the rape and murder of E.P.

185.    Specifically, defendants forcibly transported Mr. Bivens from California back to Mississippi for a crime he did not commit.  Shortly after Mr. Bivens arrived in the Forrest Country Regional Jail Complex, Defendant Sheriff Walters came to Mr. Bivens's cell and threatened him using racially-charged language while holding an open knife in his hand. Shortly thereafter, Mr. Bivens, fearing that Defendants would kill him in jail, agreed to confess and plead guilty to the crime, despite the fact that he was innocent.

186.    When Defendants arrested and interrogated Mr. Bivens more than a year after their interrogation of Mr. Ruffin, Defendants also engaged in fabrication in addition to the coercion described above.  Specifically, Defendants told Mr. Bivens what to say in his confession, coaching him to include certain details, such as the fact that a small child witnessed the murder.  This fabricated evidence, which made Mr. Bivens's confession appear to be credible and reliable, contributed to Mr. Bivens's decision to plead guilty

rather than risk going to trial.

187.    In addition, Defendants deliberately and/or recklessly ignored apparent evidence of innocence pointing to other suspects and indicating Mr. Bivens's innocence, including but not limited to the following: ignoring the statement of the only eyewitness to the crime that there was only one perpetrator; failing to interview witnesses whose knowledge tended to disprove Mr. Bivens's guilt; failing to investigate potential suspects who matched the description given by L.P., the only witness to the crime; failing to investigate exculpatory forensic evidence, including but not limited to shoe print, tire print, and serology evidence; and failing to search for a car matching the distinct characteristics observed by three separate witnesses who were present outside E.P.'s house on the night of the murder.  This evidence could and should have led Defendants to true perpetrator Andrew Harris, whose name came to investigators early on in the investigation from a reliable source as a potential suspect for the murder.

188.    Mr. Bivens's false coerced incriminating statements were the basis for the charging instrument against him and the plea agreement he signed, in violation of his Fifth Amendment right to be free from compelled self-incrimination.  As the State later stipulated, "[n]o physical or forensic evidence or independent eyewitnesses connected Larry Ruffin, Bobby Ray Dixon, or Phillip Bivens to the crime scene except statements and testimony each of them gave."

189.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1980 would have believed that Defendants' actions were lawful.

190.    As a direct and proximate result of Defendants' actions, Mr. Bivens was wrongly

convicted and imprisoned for thirty years and suffered the other grievous and continuing injuries and damages set forth above.

## COUNT V
**Plaintiff Larry Ruffin's 42 U.S.C. § 1983 Claim for Engaging in Violations of Due Process that Shock the Conscience in Violation of the Fourteenth Amendment**

191.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

192.    In their drive to secure Mr. Ruffin's wrongful arrest and conviction, the individual Defendants deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Mr. Ruffin's substantive due process rights under the Fourteenth Amendment.

193.    Specifically, Defendants targeted Mr. Ruffin despite the complete lack of evidence connecting him to the crime, violently beat him and threatened his life using explicitly racial language to coerce him into confessing, recklessly and/or deliberately disregarded evidence of his alibi, recklessly and/or deliberately ignored evidence pointing to other suspects and corroborating his innocence, fabricated evidence against him, coerced and fabricated false confessions from Mr. Dixon and Mr. Bivens that implicated Mr. Ruffin in the crime in order to ensure his conviction, coerced Mr. Dixon and Mr. Bivens into falsely testifying against Mr. Ruffin, and engaged in additional, conscience-shocking misconduct that led to the conviction and wrongful imprisonment of an innocent man.

194.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would have believed that Defendants' actions were lawful.

195.    As a direct and proximate result of Defendants' actions, Mr. Ruffin was wrongly convicted and imprisoned for twenty-two years until his death in prison and suffered the other grievous injuries and damages set forth above.

### COUNT VI
**Plaintiff Bobby Ray Dixon's 42 U.S.C. § 1983 Claim for Engaging in Violations of Due Process that Shock the Conscience in Violation of the Fourteenth Amendment**

196.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

197.    In their drive to secure Mr. Dixon's wrongful arrest and conviction, Defendants deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Mr. Dixon's substantive due process rights under the Fourteenth Amendment.

198.    Specifically, Defendants targeted Mr. Dixon despite the complete lack of evidence connecting him to the crime; violently beat him and threatened to send him to the gas chamber in order to coerce him into confessing, knowing that his confession could never be free and voluntary because he lacked the mental capacity to understand his circumstances; recklessly and/or deliberately ignored evidence pointing to other suspects and corroborating his innocence; ignored the statement of the only eyewitness to the crime that there was only one perpetrator; fabricated evidence against him; coerced him into pleading guilty and testifying against Mr. Ruffin; and engaged in additional, conscience-shocking misconduct that led to the conviction and wrongful imprisonment of an innocent man.

199.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1980 would have believed that Defendants'

actions were lawful.

200.    As a direct and proximate result of Defendants' actions, Mr. Dixon was wrongly

convicted and imprisoned for thirty years and suffered the other grievous injuries and

damages set forth above.

## COUNT VII
**Plaintiff Phillip Bivens's 42 U.S.C. § 1983 Claim for Engaging in Violations of Due
Process that Shock the Conscience in Violation of the Fourteenth Amendment**

201.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as

follows:

202.    In their drive to secure Mr. Bivens's wrongful arrest and conviction, the

individual Defendants deliberately engaged in arbitrary and conscience-shocking conduct

that contravened fundamental canons of decency and fairness and violated Mr. Bivens's

substantive due process rights under the Fourteenth Amendment.

203.    Specifically, Defendants forcefully returned Mr. Bivens to Mississippi for the

murder even though there was no evidence linking him to the crime; made violent threats

with racial overtones when Mr. Bivens first arrived in the jail; repeatedly threatened him

with violence and execution in the gas chamber in order to coerce him to confess;

educated him about the details of the crime; fabricated evidence; ignored the statement of

the only eyewitness to the crime that there was only one perpetrator; recklessly and/or

deliberately ignored evidence pointing to other suspects and corroborating his innocence;

coerced him into pleading guilty and testifying against Mr. Ruffin; and engaged in

additional, conscience-shocking misconduct that led to the conviction and wrongful

imprisonment of an innocent man.

204.    Defendants' actions were in violation of clearly established constitutional law,

and no reasonable law enforcement officer in 1980 would have believed that Defendants' actions were lawful.

205.    As a direct and proximate result of Defendants' actions, Mr. Bivens was wrongly convicted and imprisoned for thirty years and suffered the other grievous and continuing injuries and damages set forth above.

<u>**COUNT VIII**</u>
**The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Claim for Unlawful Seizure and Detention without Probable Cause in Violation of the Fourth Amendment as Incorporated through the Fourteenth Amendment**

206.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

207.    Defendants, despite knowing that probable cause did not exist to arrest, continually detain, and/or prosecute the Wrongfully Convicted Plaintiffs for the rape and murder of E.P., acted individually and in concert to cause the Wrongfully Convicted Plaintiffs to be arrested, continually detained, and prosecuted for those crimes. Defendants' conduct violated the Wrongfully Convicted Plaintiffs' rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused their wrongful detentions.

208.    The above-described acts were shocking, and were performed by Defendants deliberately, with reckless disregard for the truth, and with malice.

209.    In fact, Mr. Ruffin, Mr. Dixon, and Mr. Bivens were innocent of the rape and murder of E.P., and they were exonerated in 2010 and 2011, thirty years after their wrongful convictions.

210.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would have believed that

Defendants' actions were lawful.

211.    As a direct and proximate result of Defendants' actions, the Wrongfully

Convicted Plaintiffs were wrongly detained and prosecuted up until the time of their

convictions and suffered the other grievous and continuing injuries and damages as set

forth above.

## COUNT IX
### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Claim for First and Fourteenth Amendment Violations of Rights of Access to Courts and Executive Clemency: Violation of Affirmative Obligation to Come Forward Post-Conviction

212.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as

follows:

213.    Having secured Mr. Ruffin's, Mr. Dixon's, and Mr. Bivens's convictions by

coercing and fabricating their false confessions and fabricating other inculpatory

evidence, including by coercing Mr. Dixon and Mr. Bivens into testifying falsely against

Mr. Ruffin, and suppressing evidence regarding their own misconduct and Plaintiffs'

innocence, the individual Defendants had a clearly-established affirmative obligation to

come forward with the truth during each year after the convictions of Mr. Ruffin, Mr.

Dixon, and Mr. Bivens, until the Wrongfully Convicted Plaintiffs were exonerated.

214.    Instead, Defendants intentionally, or with reckless indifference, did not disclose

their misconduct and the Wrongfully Convicted Plaintiffs' innocence, instead continuing

to suppress the truth up until the Wrongfully Convicted Plaintiffs' exonerations in 2010.

215.    Defendants' actions directly caused the false imprisonment of these three innocent

men and the repeated denial of their post-conviction motions and parole requests, as well

as numerous other physical and bodily injuries as set forth above.

## COUNT X
### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Failure to Intervene Claim

216.     Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

217.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Plaintiffs' constitutional rights, even though those Defendants had the opportunity to so intervene.

218.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

219.     Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would have believed that Defendants' actions were lawful.

220.     As a direct and proximate result of Defendants' actions, the Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for a collective eighty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

221.     Plaintiffs hereby incorporate by reference paragraphs 1-149 and further allege as follows:

222.     Defendants Hopstein, Martin, Howell, Brown, Hart, Walters, Erwin, Taylor, Moulds, Clark, James and others yet unknown agreed among themselves and other

individuals to act in concert to deprive Mr. Ruffin, Mr. Dixon, and Mr. Bivens of their clearly established First, Fourth, Fifth, and Fourteenth Amendment rights not to be compelled as witnesses against themselves, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to have access to the courts and executive clemency.

223.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including but not limited to the following:

      a.    Defendants acted in concert to obtain Mr. Ruffin's confession through physical abuse, threats, and other means deliberately designed to exploit Mr. Ruffin's youth, as well as his obvious intellectual, emotional, and economic vulnerabilities.

      b.    Defendants acted in concert to obtain Mr. Dixon's confession through physical abuse, threats, and other means deliberately designed to exploit Mr. Dixon's extremely limited mental capacities.

      c.    Defendants acted in concert to obtain Mr. Bivens's confession through threats and other means deliberately designed to exploit Mr. Bivens's lack of sophistication and his fear of being a black man from California caught up in the rape and murder of a white woman in the South.

      d.    Defendants supplied Mr. Ruffin, Mr. Dixon and Mr. Bivens with non-public facts known to the FCSD and HPD in connection with the murder investigation, and through coercion, deception, and trickery compelled the Wrongfully Convicted Plaintiffs to adopt these facts as

56

their own by incorporating them into allegedly inculpatory statements concerning their knowledge of and involvement in the crime.

e.     Over a year after Mr. Ruffin was arrested, Defendants acted in concert to target Mr. Dixon and Mr. Bivens in order to secure additional evidence against Mr. Ruffin.  They arrested and interrogated Mr. Dixon and Mr. Bivens and coerced false confessions from them.

f.     Prior and subsequent to Mr. Ruffin's arrest, charging, and indictment, and the later arrest and charging of Mr. Dixon and Mr. Bivens, Defendants deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Plaintiffs' innocence, including but not limited to the following: intentionally failing to interview witnesses corroborating the Plaintiffs' innocence; failing to investigate forensic evidence pointing to the real killer; failing to investigate Andrew Harris despite having his name as a potential suspect; and disregarding the statement of L.P., the only person who saw the killer.

224.   As a direct and proximate result of Defendants' conspiracy and actions in furtherance of that conspiracy, the Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for a collective eighty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XII

### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1985 Conspiracy Claim

225.   Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as

follows:

226.     Defendants Hopstein, Martin, Howell, Brown, Hart, Walters, Erwin, Taylor, Moulds, Clark, and James, and others yet unknown violated the Wrongfully Convicted Plaintiffs' clearly established rights under 42 U.S.C. § 1985(3) when, motivated by racial animus, as evidenced in part by their use of racist language in the context of committing violent acts against the Wrongfully Convicted Plaintiffs, who were all African-American, Defendants agreed among themselves and other individuals to act in concert to deprive the Wrongfully Convicted Plaintiffs of equal protection of the laws by arresting and detaining the Wrongfully Convicted Plaintiffs despite the lack of any evidence connecting them to the crime; violently beating them and threatening their lives until they falsely confessed; intimidating witnesses into keeping silent about exculpatory evidence they had that would have assisted in Mr. Ruffin's defense; and securing the false confessions of Mr. Dixon and Mr. Bivens in order to strengthen the evidence against Mr. Ruffin, notwithstanding that the only eyewitness to the crime said that there was only one attacker.

227.     Defendants Hopstein, Martin, Howell, Brown, Hart, Walters, Erwin, Taylor, Moulds, Clark, and James, and others yet unknown also violated the Wrongfully Convicted Plaintiffs' rights under 42 U.S.C. § 1985(2) when, motivated by racial animus, as evidenced by their use of racist language in the context of committing violent and threatening acts, Defendants agreed among themselves and other individuals to act in concert to obstruct justice by deterring Mr. Dixon and Mr. Bivens, by force, intimidation, and other threats from pursuing their constitutional rights to go to trial and testify on their own behalf, and from testifying truthfully at Mr. Ruffin's trial; and by deterring other

witnesses, also by force, intimidation, and other threats, from testifying truthfully at Mr. Ruffin's pretrial hearings and trial.

228.    As a direct and proximate result of Defendants' conspiracy and actions in furtherance of that conspiracy, the Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for a collective eighty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XIII
### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Claim for Supervisory Liability against FCSD Supervisors

229.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

230.    Defendants Walters, Hopstein, Hart, Moulds, and John and Jane Doe Supervisors were personally involved in the case against the Wrongfully Convicted Plaintiffs and knew, or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Ruffin, Mr. Dixon, and Mr. Bivens of their clearly established constitutional rights through misconduct that included but was not limited to coercing and fabricating confessions from the Wrongfully Convicted Plaintiffs; violently beating and threatening the Wrongfully Convicted Plaintiffs; deliberately ignoring evidence of the Wrongfully Convicted Plaintiffs' innocence; and violating Defendants' ongoing affirmative obligation to come forward with the evidence of innocence and the truth of their own misconduct.

231.    The supervisory Defendants, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct participation in and facilitation of

their subordinates' misconduct, caused their subordinates to deprive Mr. Ruffin, Mr.

Dixon, and Mr. Bivens of their clearly established constitutional rights, including but not

limited to their rights not to be compelled to be witnesses against themselves, to be free

from unreasonable searches and seizures, not to be deprived of liberty without due

process of law, and to have access to the courts and executive clemency.

232.    Moreover, the supervisory Defendants allowed their subordinates to act with

impunity in an environment in which those subordinates were not supervised, disciplined,

or trained, and in which those subordinates knew that their violations of Mr. Ruffin, Mr.

Bivens, and Mr. Dixon's constitutional rights would be facilitated, approved, and/or

condoned by the supervisory Defendants.

233.    The supervisory Defendants' actions were in violation of clearly established

constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would

have believed that the supervisory Defendants' actions were lawful.

234.    As a direct and proximate result of the supervisory Defendants' actions, the

Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for

a collective eighty-two years and suffered the other grievous and continuing injuries and

damages as set forth above.

## COUNT XIV
### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 Claim for Supervisory Liability against HPD Supervisors

235.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as

follows:

236.    Defendants John and Jane Doe Supervisors were personally involved in the case

against Plaintiffs and knew, or in the absence of their deliberate indifference,

recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Ruffin, Mr. Dixon, and Mr. Bivens of their clearly established constitutional rights through misconduct that included but was not limited to coercing and fabricating confessions from the Wrongfully Convicted Plaintiffs; violently beating and threatening the Wrongfully Convicted Plaintiffs; deliberately ignoring evidence of the Wrongfully Convicted Plaintiffs' innocence; and violating Defendants' ongoing affirmative obligation to come forward with the evidence of innocence and the truth of their own misconduct.

237.    John and Jane Doe Supervisors, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Ruffin, Mr. Dixon, and Mr. Bivens of their clearly established constitutional rights, including but not limited to their rights not to be compelled to be witnesses against themselves, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to have access to the courts and executive clemency.

238.    Moreover, the supervisory Defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and in which those subordinates knew that their violations of Mr. Ruffin, Mr. Bivens, and Mr. Dixon's constitutional rights would be facilitated, approved, and/or condoned by the supervisory Defendants.

239.    The supervisory Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1979 and 1980 would

have believed that the supervisory Defendants' actions were lawful.

240.    As a direct and proximate result of the supervisory Defendants' actions, the Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for a collective eighty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

### COUNT XV
**Familial Association Plaintiffs' 42 U.S.C. § 1983 Claim for Violation of the Right to Familial Association Pursuant to the First and Fourteenth Amendments**

241.    Plaintiffs hereby incorporate by reference paragraphs 1–149 and further allege as follows:

242.    Nikki Smith and Carrie Strong are the natural children of Larry Ruffin and Kathleen Strong.  At the time of Mr. Ruffin's arrest, Nikki was approximately one year old, and Kathleen Strong was pregnant with Carrie.

243.    The individual Defendants knew that Nikki and Carrie were the children of Mr. Ruffin.

244.    On May 29, 1979, Defendants arrested Mr. Ruffin, removed him from his home and family, and brought him to the police station for a brutal, coercive interrogation used to elicit a false confession.  In order to further isolate Mr. Ruffin and to prevent his family members from attesting to the mistreatment he suffered in jail, Defendants intentionally did not allow Mr. Ruffin's family to see him for weeks following his May 29th arrest.

245.    By wrongfully arresting their father in their home and causing his wrongful conviction, knowing or having reason to know that he had nothing to do with the crime, Defendants intentionally deprived Nikki and Carrie of their right of familial association

62

with their father.  As a result of Defendants' unlawful and intentional actions, Mr. Ruffin

spent twenty-two years in prison and his daughters were effectively denied a father.

Because Defendants violated their ongoing affirmative obligation to come forward with

the evidence of Mr. Ruffin's innocence and the truth of their own misconduct,

Defendants denied Mr. Ruffin's daughters the opportunity to reunite with their father.

Instead, Mr. Ruffin remained in prison for twenty-two years and ultimately died in

prison.

246.    Defendants, through their misconduct against Mr. Ruffin, deliberately violated

Nikki and Carrie's clearly established First and Fourteenth Amendment rights to be free

from unwarranted government interference with their familial relationship to Mr. Ruffin

without due process of law.

247.    Defendants' actions were in violation of clearly established constitutional law,

and no reasonable law enforcement officer in 1979 and 1980 would have believed that

Defendants' actions were lawful.

248.    As a direct and proximate result of Defendants' actions, Nikki and Carrie suffered

the grievous and continuing injuries and damages as set forth above.

### COUNT XVI
#### The Wrongfully Convicted Plaintiffs' 42 U.S.C. § 1983 *Monell* Claim

249.    Plaintiffs hereby incorporate by reference the foregoing and further allege as

follows:

250.    The City of Hattiesburg was at all times relevant to this Complaint responsible for

the policies, practices, and customs of the Hattiesburg Police Department.

251.    Forrest County was at all times relevant to this Complaint responsible for the

policies, practices, and customs of the Forrest County Sheriff's Department.

252.    The actions of each of the individual Defendants were undertaken pursuant to a policy, practice and/or custom of the Hattiesburg Police Department and/or the Forrest County Sheriff's Department, which included but was by no means limited to:

a.  Conducting physically or psychologically coercive interrogation of witnesses, suspects, and arrestees.

b.  Using those techniques in particular to obtain confessions from vulnerable persons, such as those with mental limitations.

c.  Using excessive force on subjects in order to coerce subjects into signing false statements and confessions.

d.  Fabricating evidence, including but not limited to confessions and witness statements.

e.  Failing to document and disclose material, exculpatory, and impeachment evidence to prosecutors, defense counsel, and the court.

f.  Failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

g.  Engaging in the affirmative concealment and cover up of this type of misconduct.

253.    In addition, Forrest County and the Forrest County Sheriff Department's final policymaker, Defendant Sheriff Walters, decided to undertake and participate in physically threatening and coercive behavior during the incarceration of Phillip Bivens. This single decision by a final policymaker alone demonstrates Forrest County's custom, pattern, practice, or policy of illegal and coercive interrogations.

254.    Defendant Sheriff Walters, as Forrest County and the Forrest County Sheriff

Department's final policymaker, also ratified the unconstitutional decisions and actions of his subordinates as described more fully above.

255.    Furthermore, the City of Hattiesburg and Forrest County, by and through their final policymakers, maintained policies, customs, or patterns and practices of failing to train, supervise, and discipline HPD and FCSD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting criminal investigations; conducting custodial interrogations and witness interviews; documenting and disclosing exculpatory and impeachment evidence to prosecutors, defense counsel, and the court; and ongoing obligations to come forward with the truth.

256.    HPD and FCSD's policies, customs, or patterns and practices of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and their policies, customs, or patterns and practices of failing to train, supervise, and discipline investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the course of the investigation and prosecution of the Wrongfully Convicted Plaintiffs, and in the course of prior and subsequent cases.

257.    HPD and FCSD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train, supervise, and discipline investigators created a risk that the constitutional rights of criminal suspects like the Wrongfully Convicted Plaintiffs would be violated.

258.    The misconduct and constitutional violations committed by the individual

Defendants in the course of the investigation and prosecution of the Wrongful Convicted Plaintiffs were carried out pursuant to these policies, customs, or patterns and practices of investigative misconduct, and were directly and proximately caused by the HPD's and FCSD's failure to train, supervise, and discipline investigators.

259.    As a direct and proximate result of Forrest County and the City of Hattiesburg's policies, customs, or patterns and practices, the Wrongfully Convicted Plaintiffs were wrongly prosecuted, convicted, and imprisoned for a combined eighty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

**WHEREFORE**, Plaintiffs Phillip Bivens, the Estate of Larry Ruffin, the Estate of Bobby Ray Dixon, Laturas Smith, and Carrie Strong pray as follows:

A.    For a trial by jury for each of the plaintiffs;

B.    That the Court award compensatory damages to them and against Defendants, jointly and severally, in an amount to be determined at trial;

C.    That the Court award punitive damages to them, and against all non-municipal and non-deceased Defendants, in an amount to be determined at trial, in order to deter such conduct by Defendants in the future;

D.    For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 and 42 U.S.C. § 1985 claims; and

E.    For any and all other relief to which they may be entitled.

Dated: September 16, 2013                Respectfully submitted,


                                         /s/ Nick Brustin
                                         Peter Neufeld
                                         Nick Brustin
                                         Anna Benvenutti Hoffmann
                                         Aaron Scherzer
                                         NEUFELD SCHECK & BRUSTIN, LLP
                                         99 Hudson Street, 8th Floor
                                         New York, NY 10013
                                         Telephone: (212) 965-9081
                                         Fax: (212) 965-9084
                                         Email: nick@nsbcivilrights.com
                                         *LEAD COUNSEL*

                                         /s/ William G. Beck
                                         William G. Beck
                                         Michael Abrams
                                         Clay Britton
                                         LATHROP & GAGE LLP
                                         2345 Grand Boulevard, Suite 2800
                                         Kansas City, MO 64108
                                         Telephone: (816) 460-5811
                                         Fax: (816) 292-2001
                                         Email: WBeck@lathropgage.com


                                         /s/ Precious Martin
                                         Precious Martin MSB # 10612
                                         Suzanne Keys MSB # 5032
                                         PRECIOUS MARTIN, SR. &
                                         ASSOCIATES, PLLC
                                         821 North Congress Street
                                         Jackson, MS 29202
                                         Telephone: (601) 944-1447
                                         Fax: (601) 944-1448
                                         Email: pmartin@ptmandassoc.com


                                         ***Attorneys for Plaintiffs Phillip Bivens,
                                         the Estate of Larry Ruffin, the Estate of
                                         Bobby Ray Dixon, Laturas Smith, and
                                         Carrie Strong***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the Second Amended Complaint and Jury Demand was served by ECF on September 16, 2013, upon all parties who have appeared on ECF.


 /s/ Nick Brustin
Nick Brustin