**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

| | |
|---|---|
| PHILLIP BIVENS; the ESTATE of LARRY RUFFIN; the ESTATE of BOBBY RAY DIXON; LATURAS SMITH; and CARRIE STRONG,<br><br>Plaintiffs,<br><br>v.<br><br>FORREST COUNTY; CITY OF HATTIESBURG; Hattiesburg Police Officer RAYMOND HOWELL; Forrest County Sherriff GENE WALTERS; Forrest County Sheriff's Deputies JOE HOPSTEIN, HERBERT HART, TERRY MARTIN, and HENRY "RED" BROWN; Forrest County Regional Jail Complex Guards WAYNE R. TAYLOR and JIM ERWIN; the ESTATE of EARNEST "ARLON" MOULDS; the ESTATE of LARRY JAMES; the ESTATE of R.E. "EDDIE" CLARK; and JOHN and JANE DOE Officers and Supervisors,<br><br>Defendants. | Civil Action No. 2:13-cv-8 (KS)(MTP) |

**PLAINTIFFS' RULE 7(a) *SCHULTEA* REPLY**

Pursuant to the Order of the Court entered on August 28, 2014, D.E. 156, Plaintiffs submit their Rule 7(a) *Schultea* reply to Defendants Brown, Clark, Hopstein, Moulds, Martin, James, Hart, Erwin, and Taylor's pleas of qualified immunity, as follows:

**Additional Factual Allegations**

1. Plaintiffs hereby incorporate by reference ¶¶ 1–259 of their Second Amended Complaint and Jury Demand, D.E. 61, and further allege as follows:

## BACKGROUND

2. At around 10 p.m. on Friday, May 4, 1979, Andrew Harris raped and murdered E.P., a 25-year-old white housewife, in her Forrest County home while her four-year-old son looked on. Harris then fled the house, evading identification and capture.

3. Later that same night, Defendant Deputy Sheriff Joe Hopstein spoke with E.P.'s son L.P., who was an eyewitness to the rape and murder of his mother. Hopstein reported that L.P. said that the person who cut his mother was "a big black boy," with bushy hair and wearing some type of dark clothes. Based on Hopstein's interview and at his direction, all units began to look for a black subject.

4. The E.P. rape and murder garnered significant public and local media attention, and law enforcement, specifically including the Forrest County Sheriff's Department and the Hattiesburg Police Department, faced immediate and intense pressure to find and punish the perpetrator.

## THE TASK FORCE

5. On the afternoon of Monday, May 7, 1979, Defendant Forrest County Sheriff Gene Walters and representatives of the other area law enforcement agencies met and formed a seven-man task force to investigate E.P.'s murder.

6. Defendant Walters and the other agency policymakers named Defendant former Hattiesburg Police Chief Arlon Moulds to head the investigation and the task force. At the time, Moulds was an investigator in the district attorney's office, but was assigned full time to the task force as of May 7, 1979.

7. Upon information and belief, the Task Force was primarily under the auspices of the law enforcement agencies running the E.P. investigation, specifically including the Forrest

County Sheriff's Department and the Hattiesburg Police Department, not the District Attorney's Office; Defendant Moulds moved into an office in the Sheriff's Department and Hattiesburg Police Department building, where the Task Force was to be housed, to lead the investigation.

8. To assist Moulds in the investigation, Defendant Walters and the other agency policymakers also assigned six other law enforcement agents to the task force full time: two representatives of the Forrest County Sheriff's Department, two representatives of the Hattiesburg Police Department, and two representatives of the Mississippi Highway Patrol.

9. Defendant Walters directed all other county law enforcement officers to continue to assist the investigation as their other duties permitted.

10. Indeed, the only publicly available, police offense report documenting the E.P. rape and murder investigation lists under "officer assigned": "All."

11. For the Forrest County Sheriff's Department, Defendants Forrest County Sheriff's Chief Criminal Deputy Joe Hopstein and Deputies Terry Martin, Henry "Red" Brown, and R.E. "Eddie" Clark, and Chief Jailer Herbert Hart were assigned to or assisted the task force with the E.P. rape and murder investigation. Hopstein was Martin, Brown, and Clark's direct supervisor. Upon information and belief, as Chief Jailer, Herbert Hart was the direct supervisor of each of the Forrest County Jail Complex guards, including Defendants Taylor and Erwin, who also assisted the Task Force.

12. For the Hattiesburg Police Department, Defendant Hattiesburg Police Officer Raymond Howell was assigned to or assisted the task force with the E.P. rape and murder investigation.

13. As the leader of the Task Force, Defendant Arlon Moulds directed, supervised, and participated in the Task Force's investigative activities on the E.P. case.

14. Furthermore, Defendant Moulds admitted that, as the chief investigating officer on the E.P. rape and murder investigation, he was familiar with all the statements, whether oral or written, taken by investigators in the case.

15. In fact, according to officers working on the Task Force, the Task Force procedure was that everything an officer did was to be recorded in notes on the day that task was done; then, those notes were to be handed in to Moulds that same day and written into a report.

16. Beyond the sharing of notes and reports, upon information and belief, the Task Force—including both the officers assigned to the Task Force and those assisting it, specifically including, but not limited to Defendants Moulds, Hopstein, Brown, Clark, Martin, Hart, and Howell, as well as the Task Force's supervisors including Sheriff Walters—regularly met, discussed case strategy and progress, shared information, and divided tasks from the time the Task Force was formed on May 7, 1979, and throughout the investigation.

### THE INVESTIGATION

17. Within days of the crime, the Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—was aware of a number of important investigative facts: 1) the E.P. rape and murder had been committed by a single African-American man, with bushy hair; 2) fingerprints, shoeprints, hair, and bodily fluids had been recovered from the crime scene and could be compared to a potential suspect; 3) the perpetrator had driven a distinctive car, which had left a tire impression in the driveway; and 4) the murder weapon, which was an 8-inch silver blade, and a towel, which was likely blood-soaked, had been taken by the killer from E.P.'s home.

18. The Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—obtained and had possession of a list from E.P.'s husband of African-American men who might match the description of E.P.'s rapist and murderer and who knew E.P. and/or her husband. That list included Andrew Harris, the true lone perpetrator of E.P.'s rape and murder.

19. However, under Defendant Moulds' direction and under the supervision of Sheriff Walters, the Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—failed to effectively follow up on any of the developed investigative facts.

20. Under the direction of its lead detective Defendant Moulds and of Defendant Sheriff Walters, the Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—focused early on the residents of Hattiesburg's Restitution Center as a possible pool of suspects.

21. At the time, Larry Ruffin was known to the Task Force—specifically including but not limited to its lead detective Defendant Moulds and the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—because he was sentenced to stay at Hattiesburg's Restitution Center, following an arrest for a minor gas station theft.

22. From its formation, the Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—and Sheriff Walters were under intense

pressure to make an arrest in the E.P. rape and murder investigation. However, a month went by with no serious development of leads.

23. Then, on May 29 and 30, 1979, nearly a month after the murder, Defendants Clark, Hopstein, Martin, and Moulds obtained two statements falsely implicating Larry Ruffin: a statement from Clark's cousin Andy DeFatta and a statement from a man named Cris Williams.

24. On the evening of May 29, 1979, Defendant Deputy Clark logged out of work for a few hours and went to his aunt's house. Deputy Clark's aunt was Andy DeFatta's mother.

25. That evening, while at DeFatta's mother's and Clark's aunt's house, Clark spoke at length with his cousin Andy DeFatta.

26. Defendant Clark then returned to work. At some point that evening, Clark contacted Defendant Hopstein.

27. Hopstein came in to the Sheriff's Department, contacted Defendant Moulds, and sent Clark to pick up Andy DeFatta from the Restitution Center.

28. Clark brought DeFatta back to the Sheriff's Department, and DeFatta met with Defendant Hopstein and Moulds in an office there. Defendant Martin also joined in that meeting.

29. After a period of time, at some point that night, Andy DeFatta signed a written statement falsely implicating Larry Ruffin. Defendants Moulds and Martin also signed that statement in their own hands as witnesses, and then had the statement notarized by a clerk.

30. DeFatta's written statement, which Moulds and Martin typed out and signed as witnesses, falsely claimed that Mr. Ruffin had stated on the morning of May 4, 1979, that he was going to "cut somebody" that night and that he "really wanted a white woman," and that, in the early morning of May 29, 1979, Mr. Ruffin had confessed to DeFatta that he committed the E.P. rape and murder.

31. Beyond a simple "he said he did it," DeFatta's false statement contained a detailed description of how Mr. Ruffin purportedly described committing the crime.

32. Mr. Ruffin was actually innocent. He never made these statements to DeFatta or anyone else.

33. Moulds, Hopstein, Martin, and Clark suggested and manipulted DeFatta into describing a "confession" from Mr. Ruffin that appeared reliable and incriminating because it contained nonpublic facts about the crime that only the police and the perpetrator could have known, including but not limited to:

    a.   that the perpetrator had driven a distinctive car;

    b.   that the victim had screamed while the perpetrator was raping her;

    c.   that after she screamed, he cut her throat; and

    d.   that the perpetrator left through the front door.

34. Specifically, for example, DeFatta's written statement falsely asserted that Mr. Ruffin had confessed to riding to the crime scene in his friend's blue Ford Granada.

35. In the days following the murder, members of the Task Force or officers assisting it had taken statements from a number of E.P.'s neighbors. Defendants Moulds, Hopstein, Martin, and Clark were familiar with these statements, which had not been released to the public.

36. From those statements, Moulds, Hopstein, Martin, and Clark knew that a strange, medium-sized, possibly blue car with a round roof, shiny top, round headlights, a yellow lens park light, and two-foot long tail lights had been seen by a number of witnesses at or near E.P.'s house at or around the time of the crimes.

37. A blue Ford Granada, like DeFatta's false statement describes, matches this previously undisclosed car's distinctive description.

38. DeFatta's statement was a fabrication. Mr. Ruffin was completely innocent of any involvement in the E.P. rape and murder. He never said these things, or anything like them, to DeFatta, or anyone else.

39. Moulds, Hopstein, and Martin represented that DeFatta then suggested that another Restitution Center resident named Harold "Cris" Williams had also heard Mr. Ruffin say that he planned to "cut someone's throat" the morning of May 4, 1979.

40. In the early morning hours of May 30, 1979, Cris Williams was picked up and brought back to the Sheriff's Department.

41. Like DeFatta, Williams was questioned by Moulds, Hopstein, and Martin.

42. After a period of time, Cris Williams signed a written statement, dated May 30, 1979, falsely stating that on the morning of May 4, 1979, Larry Ruffin had said to him and Andy DeFatta that he was "going to cut someone's throat."

43. Defendant Moulds also signed Williams' statement in his own hand as a witness.

44. Williams' statement was a fabrication. Mr. Ruffin was completely innocent of any involvement in the E.P. rape and murder. He never said these things, or anything like them, to Williams, DeFatta, or anyone else.

45. Under the mounting pressure to solve the E.P. rape and murder and desperate to make an arrest, on May 29, 1979, Defendants Clark, Hopstein, Martin, and Moulds, upon information and belief, pushed and encouraged DeFatta and Williams to make statements against Mr. Ruffin, feeding, fabricating, and/or embellishing the inculpatory details of each of those statements.

46. Later that same night, Defendants Task Force Lead Detective Moulds and Hattiesburg Police Officer Howell picked up Larry Ruffin and brought him to the police station.

47. Throughout the night and over the next more than seven hours, a rotation of Defendants Hopstein, Brown, Clark, Howell, and Moulds interrogated Larry Ruffin, beating him, hurling racial slurs at him, and threatening his life, in an effort to coerce a confession from him.

48. Defendants Moulds, Brown, Clark, and Howell have already each admitted to participating in the interrogation of Larry Ruffin on the night of May 29 and into the morning of May 30, 1979.

49. Over the course of the night and morning, officers including Hopstein, Brown, Clark, Howell, Moulds, and Chief Jailer Hart moved Mr. Ruffin from room to room in the jail, passing him from one set of abusive interrogators to the next, concealing his screams of pain, and seeking to disorient and terrify him.

50. Mr. Ruffin repeatedly, and with mounting frustration and increasingly severe bewilderment, anxiety, and exhaustion, denied that he had been involved in E.P.'s rape and murder to each set of his interrogators, specifically including Moulds, Hopstein, Brown, Clark, and Howell. The officers, specifically including but not limited to Defendants Moulds, Hopstein, Brown, Clark, and Howell, each failed to take any notes of this exculpatory portion of their interrogation and refused to accept Mr. Ruffin's truthful denials, instead making clear to Mr. Ruffin that the interrogation would continue until Mr. Ruffin told Moulds, Hopstein, Brown, Clark, and Howell what they wanted to hear: that he had raped and murdered E.P. on May 4, 1979.

51. Defendants Hopstein, Brown, Clark, Howell, and Moulds each engaged in this conduct despite knowing that Mr. Ruffin did not match the description of the true perpetrator and had a corroborated alibi for the entire night of the crime.

52. In the early morning hours, Hopstein, Brown, Clark, Howell, and Moulds' persistent physical abuse, racial slurs and threats, and crowding, swarming, cajoling insistence that Mr. Ruffin raped and murdered E.P. finally overbore Mr. Ruffin's will. Mr. Ruffin, exhausted and terrified; in pain from the beatings he had received; feeling scared, crowded, and overwhelmed as the officers kept coming at him; fearing that they could grow even more aggressive and follow through on their death threats at any moment; and certain the only way to end his ordeal was to tell the officers what they wanted to hear, succumbed and said that he had done it.

53. Mr. Ruffin's will overborne, Hopstein, Brown, Clark, Howell, and Moulds fabricated and coerced a false confession from him. Mr. Ruffin was actually innocent, but the detectives coerced and manipulated him into giving a "confession" that appeared reliable and incriminating because it contained nonpublic facts about the crime that only the police and the perpetrator could have known, including but not limited to, that:

      a.   the perpetrator was wearing tennis shoes;

      b.   the perpetrator was on top of E.P., and kissing her on the mouth when her young son came into her bedroom;

      c.   E.P. was hollering and her little boy began to cry;

      d.   the perpetrator raped E.P. and cut her throat with a knife;

      e.   the victim was wearing a nightgown when she was attacked; and

      f.   the perpetrator took a towel from the kitchen that he had used to wipe off the knife.

54. In fact, Defendants Brown, Clark, Hopstein, Howell, and Moulds fed Mr. Ruffin that nonpublic information and then misrepresented that it had originated with him.

55. Defendants Brown, Clark, Hopstein, Howell, and Moulds knew that a simple admission, such as "I did it," would not be convincing as to Mr. Ruffin's guilt, especially given Mr. Ruffin's alibi evidence, the fact that he did not match the description of the perpetrator, and the methods used during his interrogation. Brown, Clark, Hopstein, Howell, and Moulds needed a detailed confession from Mr. Ruffin. It is for this reason that they fed him all of the details about the crime, including the nonpublic information that prior to Mr. Ruffin's interrogation was known only to police and Andrew Harris, the true perpetrator.

56. Though these details, in fact, had originated with Defendants Brown, Clark, Hopstein, Howell, and Moulds, they each falsely represented to the prosecutors that these corroborative facts came spontaneously from Mr. Ruffin, thereby creating the false impression that the confession was reliable.

57. Upon information and belief, Defendants Martin and Hart also participated in the interrogations of Mr. Ruffin that night, including the beatings, violent racial slurs and threats, and feeding of nonpublic facts only the police and the true perpetrator could have known.

58. Mr. Ruffin's will overborne, Defendants Moulds and Howell filled out an advice of rights card, dated that card May 30, 1979, noted the location as Forrest County Regional Jail, and coerced and manipulated Mr. Ruffin into signing the waiver card.

59. Defendants Moulds and Howell then countersigned the card in their own hands as witnesses.

60. Mr. Ruffin's will overborne, Defendants Moulds and Howell wrote out a statement, which they falsely represented was given by Mr. Ruffin. To further the false impression that Mr. Ruffin had voluntarily and spontaneously volunteered the confession, including its non-public facts, Moulds and Howell typed up the statement in the form of a question and answer,

and transcribed Mr. Ruffin's "confession" as if it was given in uninterrupted narrative form with no input from any of the detectives.

61. To further the false impression that Mr. Ruffin's statement was given spontaneously and in uninterrupted narrative form, Moulds and Howell included speaking corrections in the body of their question-and-answer narrative. For example, Moulds and Howell typed: "Me and Kathleen left in Bennie's truck and we drove over to pass-eleven, I mean By-Pass Eleven, and stopped . . . ."

62. Mr. Ruffin's will overborne, Defendants Moulds and Howell coerced and manipulated Mr. Ruffin into signing each page of the confession in the presence of a notary.

63. Defendants Moulds and Howell then signed each page in their own hands as witnesses.

64. No physical evidence tied the innocent Mr. Ruffin to the rape and murder of E.P.

65. The confession and the nonpublic facts it contained became the primary evidence against Mr. Ruffin.

66. On May 30, 1979, Sheriff Walters announced that the Task Force had arrested Larry Ruffin for the rape and murder of E.P., but that the investigation had not concluded. He directed the Task Force to continue to investigate whether others were involved in the crime with Mr. Ruffin.

67. The continuation of the E.P. rape and murder investigation proceeded on two tracks.

68. First, over the course of the next two weeks, the Task Force and the officers assisting it, who now included the guards in the jail where Mr. Ruffin was housed, continued to violently interrogate Mr. Ruffin, coercing further false and incriminating statements from him.

69. Further coerced statements were beaten from Mr. Ruffin by officers including but not limited to Defendants Brown, Clark, Erwin, and Taylor.

70. Second, when Mr. Ruffin's statements failed to produce any independently corroborative evidence and when witnesses came forward to testify to the beatings Mr. Ruffin had suffered at the hands of the Task Force members and the officers assisting them, the Task Force—specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—looked for potential "accomplices" from whom they could coerce corroborative incriminating statements.

71. In September of 1980, members of the Task Force or officers assisting it arrested Bobby Ray Dixon on a false charge of missing a work detail.

72. Mr. Dixon was intellectually disabled, and his disability was readily apparent to all who met him. Because of his disability, Mr. Dixon was easily led.

73. As they had done with Mr. Ruffin, members of the Task Force or officers assisting it brought Mr. Dixon to the police station and jail for questioning, repeating their pattern of beating, threatening, intimidating, and coercing a false confession from him.

74. Upon information and belief, as they had done with Larry Ruffin, members of the Task Force and officers assisting it, specifically including but not limited to Defendants Moulds, Brown, Clark, Hopstein, Martin, and Hart, as well as Sheriff Walters, conducted the preliminary interrogations of Mr. Dixon.

75. As Mr. Ruffin had done before him, Mr. Dixon initially denied that he had been involved in E.P.'s rape and murder or that he knew anything about it.

76. In the face of his denials, Mr. Dixon was beaten and threatened over a period of days.

77. Upon information and belief, the members of the Task Force and officers assisting it, specifically including but not limited to Defendants Moulds, Brown, Clark, Hopstein, Martin,

13

and Hart, as well as Sheriff Walters, who conducted the preliminary interrogations, beat and threatened Mr. Dixon during that period, just as they had done with Mr. Ruffin.

78. On October 3, 1980, Mr. Dixon gave a statement truthfully denying any involvement in the crime. That statement was not preserved.

79. No written statements were preserved from Bobby Ray Dixon's interrogations in the public record. No police officer notes from his interrogations are available for public access. No written record of which officers, deputies, and detectives interrogated Mr. Dixon is available for public access. Mr. Dixon passed away in 2010, and cannot be interviewed regarding exactly which detectives, deputies, or officers participated in his interrogation, even if he could remember or was ever told their names.

80. Like Mr. Ruffin before him, Mr. Dixon continued to repeatedly, and with mounting bewilderment, anxiety, and exhaustion, deny that he had been involved in E.P.'s rape and murder or knew anything about it.

81. The officers, specifically including but not limited to Defendants Moulds, Hopstein, Brown, Clark, Martin, Howell, as well as Sheriff Walters, each failed to take any notes of this exculpatory portion of Mr. Dixon's interrogation and, upon information and belief, refused to accept Mr. Dixon's truthful denials, instead making clear to Mr. Dixon that the interrogation would continue until Mr. Dixon told Moulds, Hopstein, Brown, Clark, Martin, Howell, and Walters what they wanted to hear: that he had participated in the rape and murder of E.P. on May 4, 1979, with Larry Ruffin and Phillip Bivens.

82. Upon information and belief, Defendants Hopstein, Brown, Clark, Howell, and Moulds as well as Sheriff Walters, each engaged in this conduct despite knowing that Mr. Dixon did not match the description of the true perpetrator, had a corroborated alibi for the entire night of

the crime, and that the only eyewitness to the crime had clearly stated there was a *single* perpetrator.

83. During the interrogation, Mr. Dixon was repeatedly beaten. He was thrown against a table and had a seizure as a result. He sustained an injury to his head that resulted in a scar.

84. Upon information and belief, as members of the Task Force or officers directly assisting it and following the pattern of their conduct with Larry Ruffin, Defendant Moulds, assisted by Deputies Brown, Clark, Hopstein, Martin, and Hart, as well as Sheriff Walters, participated in the persistent physical and verbal abuse of Mr. Dixon and the crowding, swarming, and cajoling insistence that Mr. Dixon assisted Mr. Ruffin and a third man Phillip Bivens in the rape and murder of E.P.

85. After an extended period of confusing and escalating coercive treatment, members of the Task Force or officers directly assisting it—upon information and belief, specifically including but not limited to its lead detective Defendant Moulds and the each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell, as well as Sheriff Walters—overbore Mr. Dixon's will and he acquiesced.

86. Mr. Dixon's will overborne, members of the Task Force or officers directly assisting it, upon information and belief, including Defendants Hopstein, Brown, Clark, Martin, Howell, and Moulds, as well as Sheriff Walters, fabricated and coerced a false confession from him. Mr. Dixon was actually innocent, but the officers coerced and manipulated him into giving a "confession" that appeared reliable and incriminating because it contained nonpublic facts about the crime that only the police and the perpetrator could have known.

87. Mr. Dixon's will overborne, Defendant Moulds and others assembled to take Mr. Dixon's videotaped "confession."

88. After obtaining Mr. Dixon's false, fabricated, and coerced statement implicating Mr. Ruffin and a third man Mr. Bivens, members of the Task Force or officers assisting it, specifically including Defendant Hart, went to California to arrest Phillip Bivens.

89. After obtaining an extradition order—upon information and belief based on Mr. Dixon's false, fabricated, and coerced statement—Defendant Hart and the other officials took Mr. Bivens back to Mississippi on a very small, private plane.

90. In Defendant Hart's presence and with his participation, officers began interrogating Mr. Bivens during the flight. In the confines of the small, shaky plane, Mr. Bivens truthfully denied participation in the rape and murder of E.P. When the officers, including Defendant Hart, failed to believe him, telling him that he was lying and that Mr. Ruffin and Mr. Dixon had already confessed, Mr. Bivens was put in fear for his life.

91. And that fear did not abate when Mr. Bivens arrived in Mississippi. Shortly after Mr. Bivens arrived and was placed in a jail cell, Defendant Sheriff Walters approached Mr. Bivens' cell. Walters carried a knife with him, displayed so that Mr. Bivens could see it. With the knife in his hand, Walters said to Mr. Bivens words to the effect of, "You niggers come down here from California and think you can kill a white woman and get away with it. Something should be done to you." Mr. Bivens' fear reached panic.

92. While waiting for the members of the Task Force or the officers assisting it to come and question him, Mr. Bivens heard through others in the jail about the physical abuse and racial taunting that had been endured by Mr. Ruffin and Mr. Dixon at the hands of Defendants Moulds, Brown, Clark, Hopstein, Martin, and Hart.

93. Upon information and belief, as they had done with Larry Ruffin and Bobby Ray Dixon, members of the Task Force and officers assisting it, specifically including but not limited to

Defendants Moulds, Brown, Clark, Hopstein, Martin, and Hart, conducted the preliminary interrogations of Mr. Bivens.

94. As Mr. Ruffin and Mr. Dixon had both done before him, Mr. Bivens initially denied that he had been involved in E.P.'s rape and murder or that he knew anything about it.

95. In the face of his denials, the Task Force members and officers assisting the Task Force—upon information and belief, specifically including but not limited to its lead detective Defendant Moulds and the each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—threatened Mr. Bivens and played on his mounting fear that he would die inside the jail.

96. No written statements were preserved from Phillip Bivens' interrogations in the public record. No police officer notes from his interrogations or written record of which officers, deputies, and detectives interrogated Mr. Bivens is available for public access. Mr. Bivens passed away in 2014; given the passage of over 30 years before Mr. Bivens was exonerated and interviewed about his experiences in the jail in 1980, when Mr. Bivens was asked, he could not remember the names of the police officers who questioned him, if he was ever even told them.

97. Upon information and belief, after repeated questioning and under the influence of his terror that "something" truly would be done to him, Mr. Bivens' will was overborne by members of the Task Force or officers directly assisting it—upon information and belief, specifically including but not limited to its lead detective Defendant Moulds and each of the officers assisting him, including Defendants Hopstein, Brown, Clark, Martin, Hart, and Howell—and Mr. Bivens' acquiesced.

98. Mr. Bivens' will overborne, members of the Task Force or officers directly assisting it, upon information and belief including Defendants Hopstein, Brown, Clark, Martin, Howell, and Moulds, fabricated and coerced a false confession from him. Mr. Bivens was actually innocent, but the Task Force coerced and manipulated him into giving a "confession" that appeared reliable and incriminating because it contained nonpublic facts about the crime that only the police and the perpetrator could have known.

99. Mr. Bivens' will overborne, Defendant Moulds, Hopstein, and others assembled to take Mr. Bivens' videotaped "confession."

**ADDITIONAL FACTS ARE PECULIARLY WITHIN DEFENDANTS' KNOWLEDGE**

100. Larry Ruffin passed away in 2002, while still in prison and eight years before his exoneration. Consequently, Mr. Ruffin could not be consulted about what he remembered of what happened to him in 1979 and 1980.

101. Bobby Ray Dixon passed away in 2010 from debilitating lung cancer, three months after he was released from prison and before he was officially exonerated. Consequently, Mr. Dixon could not be consulted about what he remembered of what happened to him in 1979 and 1980.

102. Bobby Ray Dixon was intellectually disabled, having been kicked in the head by a horse when he was a child. Mr. Dixon was easily led, unable to understand complex information, had little appreciation for legal consequences, and was illiterate. Defendants, specifically including Moulds, Hopstein, Brown, Clark, Martin, Howell, Hart, Walters, Taylor, and Erwin, each were aware of and could observe Mr. Dixon's intellectual disabilities. Even if Mr. Dixon was alive to be consulted, his ability to observe and report what had happened to him was impaired by his intellectual functioning.

103.    No written statements were preserved from Bobby Ray Dixon's interrogations in the public record. No police officer notes from his interrogations or the investigation of him are available for public access. No written record of which officers, deputies, and detectives interrogated Mr. Dixon is available for public access.

104.    No pre-trial motion hearings were held on Bobby Ray Dixon's case. No trial was held and no witnesses were called in the prosecution of Bobby Ray Dixon. Consequently, no officers, deputies, or detectives were ever questioned on the record about what happened during the investigation and interrogations of Bobby Ray Dixon.

105.    The plea colloquy from Bobby Ray Dixon's plea allocution was lost and is no longer available from the courts.

106.    Phillip Bivens passed away in August 2014, from debilitating liver cancer, which had spread to his lungs, having been first diagnosed with stage four liver cancer in 2012. Consequently, Mr. Bivens can no longer be consulted about what he remembered of what happened to him in 1979 and 1980.

107.    No written statements were preserved from Phillip Bivens' interrogations in the public record. No police officer notes from his interrogations or the investigation of him are available for public access. No written record of which officers, deputies, and detectives interrogated Mr. Bivens is available for public access.

108.    No pre-trial motion hearings were held on Phillip Bivens' case. No trial was held and no witnesses were called in the prosecution of Phillip Bivens. Consequently, no officers, deputies, or detectives were ever questioned on the record about what happened during the investigation and interrogations of Phillip Bivens.

109.   The plea colloquy from Phillip Bivens' plea allocution was lost and is no longer available from the courts.

110.   In 2013, the District Attorney's Office for Forrest and Perry Counties (the "DA's Office") represented that it could not locate the DA's case file from the capital prosecution in 1979–80 of Larry Ruffin, Bobby Ray Dixon, and Phillip Bivens. The DA's Office has indicated that although this file should still exist, that they have thus far been unable to locate it. The DA's files from Mr. Ruffin, Mr. Dixon, and Mr. Bivens' cases are not available from the State archives, and are not being housed in either the Forrest County or Harrison County Clerk's Offices. The DA's Office has produced portions of their case file from the prosecution of Andrew Harris beginning in 2010; this file contains interviews conducted beginning in 2010 and various documents which should have been in the DA's case files from Mr. Ruffin, Mr. Dixon, and Mr. Bivens' cases. This file, however, does not contain a complete duplication of the documents that should have been in the DA's case file from the capital prosecution in 1979–80 of Larry Ruffin, Bobby Ray Dixon, and Phillip Bivens. Consequently, the paper record of what actions were taken by which of the Defendants cannot be established through information obtained from sources other than the Forrest County Sheriff's Department and the Individual Defendants, who include the officers and detectives assigned to the E.P. rape and murder Task Force and the Forrest County jailer and jail guards.

111.   Also in 2013, the Forrest County Sheriff's Department represented that it had located a partial file on the E.P. rape and murder investigation. That file appeared to contain documents relating to the investigation of Larry Ruffin, but contained very few documents referring to Phillip Bivens or Bobby Ray Dixon. The Department was unable to locate a

complete file. For example, it omits reports that were specifically referred to at Mr. Ruffin's trial, and omits any reports of the investigation and interrogations of Mr. Bivens or Mr. Dixon. Consequently, the paper record of what actions were taken by which of the individual Defendants is currently incomplete and cannot be fully explored without further discovery.

112.    As the individual Defendants are parties to this lawsuit and are represented by counsel, they cannot be interviewed or questioned about what they remember of what happened during the investigation of the E.P. rape and murder without discovery.

113.    In light of each of these facts, there are a number of details about what happened over the course of the E.P. rape and murder investigation and to each of the plaintiffs that are "peculiarly within the knowledge of the defendants" and thus can only be particularly established through discovery.

## The Individual Defendants' Unconstitutional Acts

The Court ordered the Plaintiffs to file a *Schultea* reply alleging with particularly the unconstitutional acts of the individual Defendants and responding to their pleas of qualified immunity. None of the moving defendants has disputed that coercing confessions and fabricating evidence, thereby causing a wrongful conviction, violated clearly established constitutional rights in 1979. Nor could they. Since at least 1936, it has been clearly established that officers may not beat or otherwise intimidate a suspect into confessing and then use that coerced confession to convict him. See, e.g., *Brown v. Mississippi*, 297 U.S. 278 (1936); *Chambers v. Florida*, 309 U.S. 227 (1940). It has been clearly established for just as long that officers may not fabricate evidence to obtain a criminal conviction, either. See, e.g., *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) ("[T]he right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier."); *Mooney v. Holohan*, 294 U.S. 103 (1935).

Instead, the only argument the individual Defendants have made is that Plaintiffs must provide further specific facts of what the individual Defendants each did to meet qualified immunity's heightened pleading standard.

For the Court's ease of reference, Plaintiffs include below a complete list of each moving Defendant's unconstitutional acts, incorporating those acts alleged in the Second Amended Complaint and those acts alleged here:

## I.   DEFENDANT DEPUTY R.E. "EDDIE" CLARK

i.    As a member of the Task Force or an officer assisting it, Defendant Forrest County Sheriff's Deputy R.E. "Eddie" Clark met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

ii.   On May 29, 1979, Defendant Clark logged out of work and went to his aunt's house, where he met with his cousin Andy DeFatta. At some point after Clark returned to work, he contacted Hopstein, who directed him to pick DeFatta up. On May 29, 1979, beginning at his aunt's house and continuing at the police station, Clark directly participated in the fabrication of the false statement from Andy DeFatta implicating Larry Ruffin on May 29, 1979. (*Schultea* Reply at ¶¶ 23–36, 45; see also D.E. 61 at ¶¶ 46–47).

iii.  Later on the night of May 30, 1979, and continuing for days afterward, Defendant Clark coerced a false confession from Mr. Ruffin, fabricated the inculpatory details of that confession, and fabricated evidence that Mr. Ruffin had further independent, corroborative knowledge of the crime. (*Schultea* Reply at ¶¶ 46–63, 68–69; *see also* D.E. 61 at ¶¶ 49–50, 64). To do so, for example, Clark beat Mr. Ruffin, hurled racial slurs at him, and threatened him with his gun. (D.E. 61 at ¶ 51(a)–(c), (i)).

iv.  Next, to shore up the case against Mr. Ruffin, Defendant Clark participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Clark coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–87).

v.  Finally, Defendant Clark participated in the targeting and interrogation of Phillip Bivens. Upon information and belief, Clark coerced a false confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 92–98).

## II.  DEFENDANT DEPUTY HENRY "RED" BROWN

i.  As a member of the Task Force or an officer assisting it, Defendant Forrest County Sheriff's Deputy Henry "Red" Brown met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

ii.  On the night of May 30, 1979, and continuing for days afterward, Defendant Brown coerced a false confession from Larry Ruffin, fabricated the inculpatory details of that confession, and fabricated evidence that Mr. Ruffin had further independent, corroborative knowledge of the crime. (*Schultea* Reply at ¶¶ 46–56, 69; *see also* D.E. 61 at  ¶¶ 49–50, 55(a), 59–60, 64). To do so, for example, Brown beat Mr. Ruffin, hurled racial slurs at him, and threatened him with a knife. (D.E. 61 at ¶ 51(e)–(f), (h), and (i)).

iii.  Next, to shore up the case against Mr. Ruffin, Defendant Brown participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Brown coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–86).

iv.   Finally, Defendant Brown participated in the targeting and interrogation of Phillip Bivens. Upon information and belief, Brown coerced a false confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 92–98).

### III.   DEFENDANT CHIEF DEPUTY JOE HOPSTEIN

i.   As a member of the Task Force or an officer assisting the Task Force, Defendant Forrest County Sheriff's Deputy Joe Hopstein met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

ii.   As Chief Criminal Deputy, Hopstein was the direct supervisor of Defendant Deputies Clark, Brown, and James. (*See Schultea* Reply at ¶ 11).

vi.   On May 29, 1979, Defendant Clark logged out of work and met with his cousin Andy DeFatta. At some point after returning to work, Clark contacted Hopstein, who directed him to pick DeFatta up. Hopstein then directly participated in the fabrication of the false statement from Andy DeFatta implicating Larry Ruffin on May 29, 1979. (*Schultea* Reply at ¶¶ 23–36, 45; see also D.E. 61 at ¶¶ 46–47).

vii.   Defendant Hopstein also directly participated in the fabrication of a second false statement implicating Mr. Ruffin, taken from Cris Williams on May 30, 1979. (*Schultea* Reply at ¶¶ 39–43, 45; *see also* D.E. 61 at ¶ 47).

viii.   Later on the night of May 30, 1979, and continuing for days afterward, Defendant Hopstein coerced a false confession from Mr. Ruffin, fabricated the inculpatory details of that confession, and fabricated evidence that Mr. Ruffin had further independent, corroborative knowledge of the crime. (*Schultea* Reply at ¶¶ 46–63, 68–69; *see also* D.E. 61 at ¶¶ 49–50, 65). To do so, for example, Hopstein threatened to have his officers kill

Mr. Ruffin, stood by while they beat him, and threatened him with further beatings. (D.E. 61 at ¶ 51(d)–(f), (i)).

ix.   Next, to shore up the case against Mr. Ruffin, Defendant Hopstein participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Hopstein coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–87).

iii.   Finally, Defendant Hopstein participated in the targeting and interrogation of Phillip Bivens. Upon information and belief, Hopstein coerced a false confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 92–99; *see also* D.E. 61 at ¶ 94).

## IV.   DEFENDANT TASK FORCE LEAD DETECTIVE EARNEST "ARLON" MOULDS

v.   Defendant Arlon Moulds headed the Task Force to investigate the E.P. rape and murder. As the leader of the Task Force, Moulds directed, supervised, and participated in the Task Force's investigative activities. As lead investigator, he was directly aware of the actions carried out by each of the Task Force members on the case. (*Schultea* Reply at ¶¶ 6, 13–16; *see also* D.E. 61 at ¶ 32).

vi.   Defendant Moulds directly participated in the fabrication of the false statement from Andy DeFatta implicating Larry Ruffin on May 29, 1979. (Schultea Reply at ¶¶ 23, 28–36, 45; see also D.E. 61 at ¶ 46–47).

vii.   Defendant Moulds also directly participated in the fabrication of a second false statement implicating Mr. Ruffin, taken from Cris Williams on May 30, 1979. (*Schultea* Reply at ¶¶ 39–43, 45; *see also* D.E. 61 at ¶ 47).

viii.   Later on the night of May 30, 1979, and continuing for days afterward, Defendant Moulds coerced a false confession from Mr. Ruffin, fabricated the inculpatory details of that confession, and fabricated evidence that Mr. Ruffin had further independent, corroborative knowledge of the crime. (*Schultea* Reply at ¶¶ 46–63; *see also* D.E. 61 at ¶¶ 49–50, 65).

ix.   Next, to shore up the case against Mr. Ruffin, Defendant Moulds participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Moulds coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–87; *see also* D.E. 61 at ¶ 81).

x.   Finally, Defendant Moulds participated in the targeting and interrogation of Phillip Bivens. Upon information and belief, Moulds coerced a false confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 92–99; *see also* D.E. 61 at ¶ 94).

## V.   DEFENDANT DEPUTY TERRY MARTIN

i.   As a member of the Task Force or an officer assisting it, Defendant Forrest County Sheriff's Deputy Terry Martin met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

xi.   Defendant Martin directly participated in the fabrication of the false statement from Andy DeFatta implicating Larry Ruffin on May 29, 1979. (Schultea Reply at ¶¶ 23, 28–36, 45; see also D.E. 61 at ¶¶ 46–47).

xii.   Defendant Martin also directly participated in the fabrication of a second false statement implicating Mr. Ruffin, taken from Cris Williams on May 30, 1979. (*Schultea* Reply at ¶¶ 39–43, 45; *see also* D.E. 61 at ¶ 47).

xiii.   Later on that night, Defendant Martin participated in the targeting and interrogation of Larry Ruffin. Upon information and belief, Martin participated in the interrogations of Mr. Ruffin that night, including the beatings, violent racial slurs and threats, and feeding of nonpublic facts only the police and the true perpetrator could have known. (*Schultea* Reply at ¶ 57; *see also* D.E. 61 at ¶¶ 49–50, 65).

xiv.   Next, to shore up the case against Mr. Ruffin, Defendant Martin participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Martin coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–87).

ii.   Finally, Defendant Martin participated in the targeting and interrogation of Phillip Bivens. Upon information and belief, Martin coerced a false confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 92–99).

## VI.   DEFENDANT FORREST COUNTY SHERIFF'S DEPUTY LARRY JAMES

i.   As a member of the Task Force or an officer assisting it, Defendant Forrest County Sheriff's Deputy Larry James met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

ii.   Defendant James participated in the coercion of Larry Ruffin's false confession when he threatened to take Mr. Ruffin into the woods and kill him, and then proceeded to drive into the woods and park, putting Mr. Ruffin in fear for his life and demonstrating to him

that the Forrest County Sheriff's Department would stop at nothing to hold him responsible for the E.P. rape and murder. (D.E. 61 at ¶¶ 44, 153).

## VII.   DEFENDANT FORREST COUNTY SHERIFF'S DEPUTY HERBERT HART

i.   As a member of the Task Force or an officer assisting it, Defendant Forrest County Sheriff's Deputy and Chief Jailer Herbert Hart met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

ii.   As Chief Jailer, upon information and belief, Hart was the direct supervisor of Defendants Taylor and Erwin. (*See Schultea* Reply at ¶ 11).

iii.   In the early morning of May 30, 1979, Defendant Hart participated in the targeting and interrogation of Larry Ruffin, assisting the other officers in moving Mr. Ruffin from room to room during his interrogation. Upon information and belief, Hart participated in the interrogations of Mr. Ruffin that night, including the beatings, violent racial slurs and threats, and feeding of nonpublic facts only the police and the true perpetrator could have known. (*Schultea* Reply at ¶¶ 49, 57; *see also* D.E. 61 at ¶¶ 49–50, 65).

xv.   Next, to shore up the case against Mr. Ruffin, Defendant Hart participated in the targeting and interrogation of Bobby Ray Dixon. Upon information and belief, Hart coerced a false confession from Mr. Dixon and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 74–77, 81–87).

iv.   Finally, Defendant Hart participated in the targeting and interrogation of Phillip Bivens. Hart went to California to arrest Mr. Bivens, and brought him back to Mississippi on a small plane. While on the small and shaky plane, Hart observed and participated in the coercive interrogation of Mr. Bivens. Upon information and belief, Martin coerced a false

confession from Mr. Bivens and fabricated the inculpatory details of that confession. (*Schultea* Reply at ¶¶ 88, 90, 92–99: *see also* D.E. 61 at ¶ 90).

## VIII.   DEFENDANT FORREST COUNTY REGIONAL JAIL COMPLEX GUARDS WAYNE R. TAYLOR & JIM ERWIN

    i.    As officers assisting the Task Force, Defendants Forrest County Regional Jail Complex Guards Wayne R. Taylor and Jim Erwin met with, discussed case strategy and progress with, and carried out tasks for the Task Force, its members, and supervisors on the investigation of the E.P. rape and murder. (*See Schultea* Reply at ¶¶ 5–16).

    ii.    In the days and weeks after May 30, 1979, Defendants Taylor and Erwin together coerced further false statements from Mr. Ruffin, by repeatedly and brutally beating him, and participated in the fabrication of further inculpatory details in those statements. (D.E. 61 at ¶¶ 55, 155; *see also Schultea* Reply at ¶ 69).

## IX.   PARTICULAR ALLEGATIONS OF FACT SUPPORTING PLAINTIFFS' CONSPIRACY CLAIMS

As further detailed above, Plaintiffs have adequately alleged that each individual Defendant engaged in specific constitutional violations. Beyond Plaintiffs' allegations that Defendants' individual constitutional violations amount to a concert of action among all of the individual Defendants, Plaintiffs have further alleged the following facts supporting Plaintiffs conspiracy claims:

    i.    "On the afternoon of Monday, May 7, 1979, Defendant Forrest County Sheriff Gene Walters and representatives of the other area law enforcement agencies met and formed a seven-man task force to investigate E.P.'s murder." (*Schultea* Reply ¶ 5).

    ii.    "Defendant Walters and the other agency policymakers named Defendant former Hattiesburg Police Chief Arlon Moulds to head the investigation and the task force. At the time, Moulds was an investigator in the district attorney's office, but was assigned full time to the task force as of May 7, 1979." (*Schultea* Reply ¶ 6).

iii.   "Upon information and belief, the Task Force was primarily under the auspices of the law enforcement agencies running the E.P. investigation, specifically including the Forrest County Sheriff's Department and the Hattiesburg Police Department, not the District Attorney's Office; Defendant Moulds moved into an office in the Sheriff's Department and Hattiesburg Police Department building, where the Task Force was to be housed, to lead the investigation." (*Schultea* Reply ¶ 7).

iv.   "To assist Moulds in the investigation, Defendant Walters and the other agency policymakers also assigned six other law enforcement agents to the task force full time: two representatives of the Forrest County Sheriff's Department, two representatives of the Hattiesburg Police Department, and two representatives of the Mississippi Highway Patrol." (*Schultea* Reply ¶ 8).

v.   "Defendant Walters directed all other county law enforcement officers to continue to assist the investigation as their other duties permitted." (*Schultea* Reply ¶ 9).

vi.   "Indeed, the only publicly available, police offense report documenting the E.P. rape and murder investigation lists under 'officer assigned': 'All.'" (*Schultea* Reply ¶ 10).

vii.   "For the Forrest County Sheriff's Department, Defendants Forrest County Sheriff's Deputies Joe Hopstein, Terry Martin, Henry "Red" Brown, R.E. "Eddie" Clark, and Herbert Hart were assigned to or assisted the task force with the E.P. rape and murder investigation." (*Schultea* Reply ¶ 11).

viii.   "For the Hattiesburg Police Department, Defendant Hattiesburg Police Officer Raymond Howell was assigned to or assisted the task force with the E.P. rape and murder investigation." (*Schultea* Reply ¶ 12).

ix.   "As the leader of the Task Force, Defendant Arlon Moulds directed, supervised, and participated in the Task Force's investigative activities on the E.P. case." (*Schultea* Reply ¶ 13).

x.   Furthermore, Defendant Moulds admitted that, as the chief investigating officer on the E.P. rape and murder investigation, he was familiar with all the statements, whether oral or written, taken by investigators in the case. (*Schultea* Reply ¶ 14).

xi.   In fact, according to officers working on the Task Force, the Task Force procedure was that everything an officer working on the Task Force did was to be recorded in notes on the day that task was done; then, those notes were to be handed in to Moulds that same day and written into a report. (*Schultea* Reply ¶ 15).

xii.   Beyond the sharing of notes and reports, upon information and belief, the Task Force— including both the officers assigned to the Task Force and those assisting it, specifically including, but not limited to Defendants Moulds, Hopstein, Brown, Clark, Martin, Hart, and Howell, as well as the Task Force's supervisors including Sheriff Walters—regularly

met, discussed case strategy and progress, shared information, and divided tasks from the time the Task Force was formed on May 7, 1979, and throughout the investigation. (*Schultea* Reply ¶ 16).

xiii.    As detailed above, each individual Defendant is alleged to have individually engaged in specific, blatant constitutional violations, including beating confessions from Plaintiffs and fabricating evidence in a capital murder case. These individual constitutional violations—many of which were committed openly in each others' presence—were all committed towards a single aim: to convict Larry Ruffin, Bobby Ray Dixon, and Phillip Bivens of the rape and murder of E.P.


Dated: October 3, 2014                     Respectfully submitted,
New York, NY


                                           /s/ Anna Benvenutti Hoffmann
                                           Peter Neufeld
                                           Nick Brustin
                                           Anna Benvenutti Hoffmann
                                           NEUFELD SCHECK & BRUSTIN, LLP
                                           99 Hudson Street, 8th Floor
                                           New York, NY 10013
                                           Telephone: (212) 965-9081
                                           Fax: (212) 965-9084
                                           Email: aaron@nsbcivilrights.com
                                           *LEAD COUNSEL*

                                            /s/ William G. Beck
                                           William G. Beck
                                           Michael Abrams
                                           Clay Britton
                                           LATHROP & GAGE LLP
                                           2345 Grand Boulevard, Suite 2800
                                           Kansas City, MO 64108
                                           Telephone: (816) 460-5811
                                           Fax: (816) 292-2001
                                           Email: WBeck@lathropgage.com

                                           /s/ Suzanne Keys
                                           Suzanne Keys MSB # 5032
                                           Ratoya Gilmer MSB # 104487
                                           PRECIOUS MARTIN, SR. & ASSOCIATES, PLLC
                                           821 North Congress Street
                                           Jackson, MS 29202

Telephone: (601) 944-1447
Fax: (601) 944-1448
Email: skeys@ptmandassoc.com

***Attorneys for Plaintiffs Phillip Bivens, the Estate
of Larry Ruffin, the Estate of Bobby Ray Dixon,
Laturas Smith, and Carrie Strong***

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the Plaintiffs' Rule 7(a) *Schultea* Reply was served *via* ECF on October 3, 2014 upon all parties who have appeared on ECF.

 /s/ Anna Benvenutti Hoffmann
Anna Benvenutti Hoffmann